UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

VINCENT MORRIS, *et al.*,

      Plaintiffs,

      v.                       No. 1:20-cv-00034-DRL-SLC

SHERIFF OF ALLEN COUNTY, *et al.*,

      Defendants.

**Memorandum in Support of Motion for Summary Judgment**

Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org

Samuel L. Bolinger
803 S. Calhoun St.
Suite 300
Fort Wayne, IN 46802
260/407-0040
mark@slblawfirm.org

Attorneys for Plaintiff and the
Certified Class

## <u>STATEMENT OF THE ISSUE</u>

Are the conditions present in the Allen County Jail that feature – among other things – chronic and serious overcrowding, insufficient staff, endemic violence, and inadequate recreation, violative of the requirements imposed by the United States Constitution, thus justifying declaratory and injunctive relief on behalf of the prisoners confined to the Jail?

# TABLE OF CONTENTS

Statement of the Issue ................................................................................. i

Table of Contents ....................................................................................... ii

Table of Authorities .................................................................................. iv

Introduction ............................................................................................... 1

Statement of Material Facts ....................................................................... 1

    I.      Background as to the Allen County Jail ....................................... 1

    II.     The Jail Population ...................................................................... 4

    III.    Prisoner supervision and jail staffing........................................... 7

    IV.    The Jail's physical plant.............................................................. 12

    V.     Ongoing problems caused by overcrowding and inadequate supervision at the Jail ................................................................. 12

        A.    Frequent violence in the Jail ...................................... 12

        B.    The lack of recreation in the Jail................................. 15

        C.    The inability of staff to respond to emergencies.............. 16

        D.    Other serious safety and habitability concerns in the Jail................. 18

        E.    Contraband in the Jail ............................................... 19

        F.    Classification issues .................................................. 20

    VI.    The reaction of the County to problems at the Jail ........................ 21

Argument ................................................................................................... 22

    I.      Legal standards applying to Eighth and Fourteenth Amendment claims ...... 22

    II.     Plaintiffs have been denied the minimal civilized measures of life's necessities, resulting in substantial risks to their health and safety ............... 23

        A.    The risk of violence caused by the overcrowding is a constitutional violation.................................................. 24

B.    The lack of staff is a factor that contributes to the Jail being
      unable to provide the basic necessities of life to the prisoners and
      is unconstitutional ............................................................................    25

C.    The conditions imposed on prisoners in their crowded cells contribute
      to the denial of the minimal civilized measures of life's
      necessities ......................................................................................    27

D.    The failure to provide the prisoners with sufficient recreation, which
      aggravates the tension and violence in the Jail, violates the
      Constitution......................................................................................    28

E.    Issues surrounding classification exacerbate overcrowding and
      violence ...........................................................................................    30

F.    Conclusion ......................................................................................    31

III.   The Court should enter specific relief, within the constraints imposed by the Prison
       Litigation Reform Act, to require the County to cure the constitutional
       deficiencies ...............................................................................................    31

A.    Injunctive relief addressed to a long-term solution............................    33

B.    Injunctive relief addressed to a short-term solution...........................    34

C.    Plaintiffs' ability to seek further relief................................................    35

Conclusion ...............................................................................................................    35

# TABLE OF AUTHORITIES

**Cases:**

*Ashley v. Mollenhauer*, 2013 WL 432907 (N.D. Ind. Jan. 31, 2013) ........................................... 28

*Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) ............................................................ 26

*Budd v. Motley*, 711 F.3d 840 (7th Cir. 2013) ................................................................. 23, 24, 28

*Davenport v. DeRobertis,* 653 F. Supp. 649 (N.D. Ill. 1987), *aff'd and modified*, 844 F.2d 1310 (7th Cir. 1988)..................................................................................................................... 29

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................................... 23, 24, 31

*French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) ..................................................... 24, 25, 27, 28

*Ginest v. Bd. of Cty. Comm'rs. of Carbon Cty.*, 333 F. Supp. 2d 1190 (D. Wyo. 2004).............. 32

*Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019)................................................................... 23

*Hutto v. Finney*, 437 U.S. 678 (1978)......................................................................................... 32

*Inmates of Occoquan v. Barry*, 844 F.2d 828 (D.C. Cir. 1988).................................................. 30

*James v. Milwaukee Cnty.*, 956 F.2d 696 (7th Cir. 1992)........................................................... 23

*Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989)....................................................................... 23

*Kingsley v. Hendrickson,* 576 U.S. 389 (2015)........................................................................... 23

*Lightfoot v. Walker,* 486 F. Supp. 504 (S.D. Ill. 1980)............................................................... 29

*Mark v. Officers Olson, Haglin, Harsma Granton's 1st, 2nd, 3rd Shift Officers Between Dates of 7-29-02, 8-13-02*, 2003 WL 23221515 (W.D. Wis. Oct. 21, 2003) ......................................... 28

*McCreary v. Parker*, 456 Fed. App'x 790 (11th Cir. 2012) ........................................................ 30

*Nami v. Fauver*, 82 F.3d 63 (3d Cir. 1996)................................................................................. 27

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980)........................................................................ 26

*Rhodes v. Chapman*, 452 U.S. 337 (1981)................................................................. 23, 24, 27, 32

*Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012) ............................................. 24

*Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085 (7th Cir. 1986) ............................................ 30

*Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015) ................................................................................. 22

*Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013) ............................................................................. 27

*Walsh v. Mellas*, 837 F.2d 789 (7th Cir. 1988) ............................................................................. 30

*Webb v. Deboo*, 423 Fed. App'x 299 (4th Cir. 2011) .................................................................... 24

*Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) ............................................................................. 34

## Constitutional Provisions:

Eighth Amendment ..................................................................................................................... *passim*

Fourteenth Amendment .......................................................................................................... 22, 31

## Statutes:

18 U.S.C. § 3626 ........................................................................................................................... 32

18 U.S.C. § 3626(a)(1) .................................................................................................................. 34

18 U.S.C. § 3626(a)(1)(A) ...................................................................................................... 33, 35

18 U.S.C. § 3626(a)(1)(C) ......................................................................................................... 1, 32

18 U.S.C. § 3636(a)(3)………………………………………………………………………..35

18 U.S.C. § 3626(a)(3)(A) ............................................................................................................ 32

## Other Authorities:

Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (June 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correct ......................................... 28

## Introduction

The Allen County Jail has 732 beds, but routinely houses many more prisoners than that, even though the Sheriff and experts agree that a jail is functionally overcrowded at between 80% and 85% of its capacity. It has only 137 correctional staff persons to supervise the prisoners, despite the fact that a staffing survey in 2013 indicated that it needed a minimum of 171 correctional staff to assure prisoner and staff safety, and despite the fact that the Sheriff estimates that more than 200 staff persons are necessary today. The result of the overcrowding and staffing insufficiency is predictable and conceded by the Sheriff—tensions caused by overcrowding erupt into frequent violence that is often not even seen, let alone controlled, by the limited staff. Emergencies occur and prisoners are left to fend for themselves or experience long and dangerous delays in responses by the staff. The Jail is consistently overcrowded and is unsafe. It fails to meet applicable constitutional standards because of its overcrowding, and all that flows from it, as well as because of its inadequate staff. There are no contested issues of material fact, and this Court should enter summary judgment for the plaintiffs, declaring that the Jail violates the constitutional rights of the prisoners confined there, and the Court should enter appropriate injunctive relief consistent with the requirements of the Prison Litigation Reform Act. 18 U.S.C. § 3636(a)(1)(C).

## Statement of material facts

## I.    Background as to the Allen County Jail

The current Allen County Jail was opened in 1981 and was added onto in 1994, 1998, and most recently in 2004. (Deposition of David Butler, Docket No. [Dkt.] 40-1 at 8 [ll. 4-14]).[1] It

---

[1]    All deposition and exhibit citations in this memorandum are to the page numbers in the documents. David Butler is the Jail Commander of the Allen County Jail and testified as the designate of the Allen County Sheriff pursuant to Fed. R. Civ. P. 30(b)(6). (Dkt. 40-1 at 4 [ll.13-16]; Ex. 1 to Dkt. 40-1).

currently has 732 permanent beds. (*Id.* at 8 [ll. 15-22]).[2] The Jail is spread over five floors. (Ex. 3 to 40-1 at pp. 2-8). The cell blocks, their locations, and their capacities are as follows:

| Cell block | Built | Total beds | Male / Female | Cells w/ 1 bed | Cells w/ 2 beds | Cells w/ 6 beds | Dormitory | In-cell comms |
|---|---|---|---|---|---|---|---|---|
| A | 1981 | 36 | M | 4 | 16 | | | |
| B | 1981 | 40 | M | | 20 | | | |
| C | 1981 | 38 | M | 2 | 18 | | | |
| D | 1981 | 36 | M | 4 | 16 | | | |
| E | 1981 | 12 | M | | 6 | | | |
| F | 1981 | 8 | M | | 4 | | | |
| G | 1981 | 8 | M | | 4 | | | |
| W | 1981 | 12 | M | | 6 | | | |
| H | 1981 | 20 | M | | 10 | | | |
| K | 1981 | 20 | M | | 10 | | | |
| I | 1994 | 19 | M | 1 | 9 | | | |
| J | 1994 | 18 | M | 2 | 8 | | | |
| L | 1994 | 20 | M | | 10 | | | |
| M | 1994 | 20 | M | | 10 | | | |
| N | 1994 | 26 | M | | | | x | |
| O | 1994 | 20 | M | | | | x | |
| P | 1994 | 20 | F | | 10 | | | |
| Q | 1994 | 20 | F | | 10 | | | |
| S | 1998 | 24 | M | | | | x | |
| U | 1998 | 24 | M | | | | x | |
| X | 1998 | 12 | F | | 6 | | | |
| Y | 1998 | 8 | F | | 4 | | | |
| Z | 1998 | 20 | F | | 10 | | | |
| 6A | 2004 | 49 | M | 1 | 18 | 2 | | x |
| 6B | 2004 | 58 | M | | 20 | 3 | | x |
| 6C | 2004 | 49 | M | 1 | 18 | 2 | | x |
| 6D | 2004 | 58 | M | | 20 | | | x |
| 6F | 2004 | 34 | F | | 11 | 2 | | x |
| Rcvng | | 3 | | 3 | | | | |
| | | 732 | | | | | | |

---

[2]    At some point in the past the rated capacity was 741, but the Jail has lost beds and the Jail Commander performed an audit in the latter part of 2020, physically identifying every bed, and counted 732 beds. (Dkt. 40-1 at 9 [ll. 4-13]; at 10 [ll. 7-11]).

(Ex. 3 to Dkt. 40-1 at 1).

The two-person cells in the original portion of the Jail are 94.86 square feet. (*Id.* at 18 [l. 9] – 19 [l. 9]). The cells in the 1994 and 1998 additions are 123.46 square feet. (*Id.*). And the cells in the newest addition are 156.49 square feet. (*Id.*). Each of the two-person cells contains two bunks affixed to the wall, one on top of the other, and a toilet-sink unit. (Dkt. 40-1 at 19 [ll. 8-14]). The cells in the portions of the Jail built after 1981 also contain a small stool and writing table, both affixed to the wall. (*Id.* at 19 [ll. 15-21]). The single-person cells contain the same fixtures as the other cells on their block, except that they do not have the upper bunk. (*Id.* at 20 [ll. 15-24]). The doors to the cells are solid, with a small window at eye height, and most have a small opening that unbolts to slide a food tray through. (*Id.* at 20 [l. 25] – 21 [l. 11]). Outside the cells there is an area within a locked perimeter where prisoners can go during some times of the day. (*Id.* at 21 [l. 24] – 22 [l. 7]). In this "day area" there are showers, metal tables affixed to the floor, with seating, a television, telephones, and kiosks used for video visitation. (*Id.* at 22 [l. 8] – 24 [l. 5]; Declaration of Steven J. Hecke, Dkt. 40-8 ¶ 8).

The four dormitory blocks feature steel bunk beds affixed to either the floor or wall. (*Id.* at 21 [ll. 15-23]). The dormitories also contain showers, tables, and a television. (*Id.* at 24 [ll. 17-20]). The cells in the five blocks added in the 2004 build-out—6A, 6B, 6C, 6D, and 6F—contain a call button that rings into the Jail's control room in the downstairs area of the Jail. (*Id.* at 26 [ll. 3-11]; 56 [ll. 11-13]). None of the other blocks contain call buttons, either within individual cells or in the day rooms. (*Id.* at 26 [ll. 9] – 27 [l.13]).[3]

There are video cameras that provide some visibility into each cell block. (*Id.* at 24 [ll. 14-

---

[3]    The Jail also contains a 56-bed lockup unit for arrestees who are held for short periods of time. (Dkt 40-1 at 46 [l. 3]-47 [ l. 19]). Although the Sheriff staffs the area, the beds are not included in the 732 figure or the population figures used in this memorandum (*id*), and the unit is not part of this litigation.

16]). However, the cameras generally do not observe individual cells. (*Id.* at 18 [ll. 18-22]). There are three receiving cells that are sometimes used to house severely mentally ill prisoners, and these cells contain cameras. (*Id.* at 12 [l. 10] – 13 [l. 3]; 26 [ll. 19-22]). There are also a few cells in some of the blocks that have cameras in them, so they can be used to monitor suicidal detainees. (*Id.* at 26 [l. 23] – 27 [1. 10]). Otherwise, the cells are not observed by cameras. (*Id.* at 27 [ll. 11-13]). The camera feed can be seen by officers in "modules" that are on the blocks, as well as the control room in the downstairs area of the Jail. (*Id.* at 56 [ll. 9-13]).

## II.    The Jail population

A jail is overcrowded long before every bed is filled. (*Id.* at 34 [l. 3] – 35 [l. 15]). This is because there must be enough beds in the proper cell locations so that prisoners can be adequately classified and separated. (*Id.* at 36 [ll. 3-15]). Not only does the Allen County Jail classify by separating male and female prisoners, but it also attempts to place prisoners in different cell blocks, based on the following classifications: general population, minimum security, maximum security, medical, and protective custody. (Ex. 3 to Dkt. 40-1 at p. 1). Thus, as noted in a recent study by Elevatus Architecture of the Allen County criminal justice system that was commissioned by the Allen County Commissioners,

> [e]ven though the rated capacity is 741, the actual number at which the jail is considered operationally full is 593, which is 80% of rated capacity. The dynamics of a jail, with unpredictable inputs and daily fluctuations in population, require management flexibility in the form of a few empty beds. Because of this, a jail is at capacity before reaching its design limit, or rated capacity. Once the count starts to exceed the 80% level, properly classifying and placing inmates with like inmates becomes more difficult, and potentially dangerous for both inmates and staff, and you end up placing maximum security inmates among minimum security inmates, causing a possible volatile situation.

(Ex. 2 to Deposition of Cory Miller, Dkt. 40-2 at 5)  (internal quotation mark omitted).[4] The Allen County Jail Commander, the Sheriff's designate, agreed that at 80% to 85% of capacity, the Jail is overcrowded in that to try to properly classify persons, prisoners will have to be placed in cell blocks where there are not available permanent beds. (Dkt. 40-1 at 36 [ll. 3-23]).[5]

The precise capacity percentage is of little import here because there are almost always more prisoners in the Jail than there are beds, and this is not a new phenomenon. The average daily population of the Jail was as follows for the years noted:

| | |
|------|-----|
| 2016 | 796 |
| 2017 | 820 |
| 2018 | 876 |
| 2019 | 861 |

(Ex. 2 to Dkt. 40-2 at 85). This number dipped in 2020 to an average of 759 (*id.*), but only because the Sheriff, attempting to manage the coronavirus epidemic, severely restricted the admission of new prisoners for two periods during the year, refusing to accept most persons charged with misdemeanors and nonviolent offenses, (Dkt. 40-1 at 30 [l. 25] – 31 [l. 31]). However, when those restrictions were not in effect in 2020, the population soared to 900. (*Id.* at 31[ll. 13-15]). And, in 2021, the daily census of the Jail remains much greater than the facility's 732 beds, as shown by a

---

[4]     Elevatus is a Fort Wayne based architecture firm that has been involved with the building of more than 80 jails in multiple states as well as multiple publicly and privately run prisons. (Dkt. 40-2 at 6 [l.16] – 7 [l. 7]). It was hired by the Allen County Commissioners to perform a top-to-bottom study of the facility needs of the Allen County criminal justice system, including the Allen County Jail. (*Id.* at 8 [l. 13] – 9 [l. 4]). Elevatus has done or participated in similar studies in other counties. (*Id.* at 8 [ll. 1-7]). As noted, it utilized 741 as the number of beds in the Jail, rather than the actual number of 732.

[4]     Dr. Richard Kiekbusch, an Associate Professor of Criminology who has over 20 years of experience in correctional administration, including 13 years in jail management in three states, as well as being past president of the American Jail Association, notes that the "prevailing wisdom" concerning optimum jail capacity is that the bed count of a jail should be about 120 percent of the prisoner count, or that prisoners should occupy roughly 83% of available beds. (Ex 1 to Declaration of Dr. Rickard Kiekbusch, Ph.D., Dkt. 40-3 at 1).

sampling of daily population numbers:

| | |
|---|---|
| February 28, 2021 | 783 |
| March 15, 2021 | 807 |
| March 31, 2021 | 788 |
| April 14, 2021 | 793 |
| May 5, 2021 | 774 |

(Excerpts of Ex. A to Second Set of Interrogatories to Defendant Sheriff, Dkt. 40-4 at 4-5; Additional census sheets produced by counsel for the Sheriff on May 21, 2021, Dkt. 40-24).

Given the persistence of the Jail having more persons in it than beds, the Jail Commander believes that the current jail capacity easily needs to be over 1,000. (Dkt. 40-1 at 77 [ll. 20-25]). Of course, the Jail's capacity is not over 1,000 and, as a result, prisoners are required to live in cells where they do not have a permanent bed. Instead, they are forced to sleep on the floor of the cells with the permanent beds occupied by other prisoners. (*Id.* at 36 [ll. 16-23]). There are also prisoners on the floors of the dormitory blocks. (Declaration of Anthony Herron Dkt. 40-5 ¶ 4). Prisoners on the floor may be given plastic frames, or "boats," for their mattresses that allow the mattresses to be held three to four inches off the ground. (*Id.* at 12 [ll. 2-9]).[6] Prisoners note that it is common for every cell on a block to have an extra person on the floor. (Declarations of Quenton Davis, Dkt. 40-6 ¶ 6; Nicholas Greenlee, Dkt. 40-7 ¶¶ 7, 14; Dkt. 40-8 ¶¶ 5, 7; Adrian A. Eguia, Dkt. 40-9 ¶¶ 5 [noting that in 6-person cells there are two extra persons on the floor]; Eric Tate, Dkt. 40-10 ¶ 4; Kevin Johnson, Dkt. 40-11 ¶ 6; Larry Perry, Jr., Dkt. 40-14 ¶ 4; Demetri Beachem, Dkt. 40-15 ¶¶ 4-6; Nicholas Miller, Dkt. 40-16 ¶¶ 4-5; Neil Bryant, Dkt. 40-18 ¶ 4)**.** There is only one prisoner on the floor in the two-person cells as there is not enough room in the cells for more than one additional mattress. (Dkt. 40-1 at 38 [ll.1-3]).

---

[6]    Prisoners report that not all persons on the floor are provided with boats. (Declarations of Larry Perry, Jr., Dkt. 40-14 ¶ 6; Demetri Beachem, Dkt. 40-15 ¶ 4). Whether they are or not is not material.

Prisoners, including those on the floor of cells, are locked into their cells at night. (40-1 at 37 [ll. 21-25]). Prisoners in the general non-disciplinary cell blocks are let out of their cells into the locked day area for parts of the day. (Dkt. 40-1 at 24 [l. 21] – 25 [l. 5]). When prisoners are allowed out of their cells into the day areas, their cell doors remain open. (*Id.* at 28 [l. 14] – 29 [l. 6]). Those in protective custody are released twice a day for an hour each time. (Dkt. 40-7 ¶ 16; Dkt. 40-10 ¶ 7). Prisoners in the disciplinary units in the Jail are allowed out for only one hour a day, and only one cell at a time. (Dkt. 40-1 at 25 [ll. 9-16]). There is no recreation equipment in the day areas, and prisoners note that vigorous physical activity is not possible there, both because of the lack of equipment and because of the lack of space. (Dkt. 40-8 ¶ 9; Dkt. 40-9 ¶ 14; Declaration of Earl Armour, Dkt. 40-12 ¶ 8; Dkt. 40-15 ¶ 16; Dkt. 40-18 ¶ 10). The Jail Commander concedes that the day areas can become too crowded for prisoners to engage in any activity that is very physical. (*Id.* at 61 [l. 23] – 62 [l. 16]). The Jail has one indoor and one outdoor recreation area that are next to each other, but recreation has been suspended during the pandemic. (*Id.* at 59 [l. 12] – 60 [l. 8]). However, before COVID prisoners were offered recreation for only one hour a week, at most. (*Id.* at 60 [ll. 9-14]; Dkt. 40-7 ¶ 28 [noting that before the pandemic prisoners were offered recreation two times a month, at most]).

The Jail Commander has observed that the population of the Jail has continued to increase during his tenure, apart from the brief and limited COVID restrictions, and he can see no reason why the population will not continue to increase. (Dkt. 40-1 at 38 [ll. 4-15]). The Elevatus study projects that the average daily population will increase by 20 persons a year. (Dkt. 40-2 at 16 [l. 13] – 17 [l. 2]; Ex. 2 to Dkt 40-2 at 85).

## III.    Prisoner supervision and jail staffing

There is a module in each block where staff can observe the common areas on the blocks,

although most modules cover more than one block. (Dkt. 40-1 at 16 [l. 5-24]).[7]  At most, one correctional officer is typically assigned to each module. (*Id.* at 17 [l. 9] – 18 [l. 5]). The correctional officers in the modules cannot see into the cells, because, as noted, the interiors of most cells are not visible by camera. (*Id.* at 17 [ll. 6-8]). Although the video feeds from the common areas of the cell blocks are also visible to officers who are in the main control room for the Jail, it is the primary responsibility of the officer assigned to the block to monitor the camera, as the control room is observing multiple areas of the Jail and is responsible for opening doors throughout the Jail. (*Id.* at 56 [ll. 9- 22]).  In any event, a camera view is only a supplement to actual eyes-on observation of prisoners "because the camera only captures what happens at a particular moment. If a jail officer does not have eyes on the camera at the exact moment that happens, they will not be able to see what goes on." (Deposition of William Wilson, Dkt. 40-20 at 22 [l. 20] – 23[l. 4]).[8] The visible presence of the staff has a bearing on how prisoners behave. (*Id.* at 19 [ll. 5-7]). As one prisoner noted, "[i]f the guards were more frequently on the units, it would help defuse the tension that is always there because of how crowded it is." (Dkt. 40-15 ¶ 12).

Given that the Jail is not designed so that prisoners can be constantly observed, frequent walk-throughs of the cell blocks are necessary. (Dkt. 40-1 at 27 [ll. 19-23]).[9] There are three shifts

---

[7]    The following cell blocks have a common module: A and B; C and D; H and K; I and J; L and M; N and O; P and G; S and U; 6-A and 6-B; 6-C and 6-D; and X, Y, and Z. (Dkt. 40-1 at 16 [ll. 5-24]).

[8]    William Wilson, who was the Jail Commander at the Monroe County Jail for 16 years has, for the last five years, been the jail services coordinator for the Indiana Sheriff's Association and is responsible for assisting sheriffs and doing training regarding jail operations. (Dkt. 40-20 at 4 [l. 18] – 6 [l. 9]). He has also performed between 50 and 60 staffing analyses for jails in Indiana, Michigan, Ohio, and Alabama, including for Allen County. (*Id.* at 8 [ll. 13-20]).

[9]    Modern jails are designed with central observation points, and cell blocks oriented as pods, as opposed to linearly, so that cells may be observed directly by staff able to look at every aspect of the cell block. (Dkt. 40-20 at 15 [ll. 14-22]), Direct supervision of the prisoners allows for closer monitoring of the prisoners by fewer officers. (Ex. 7 to Dkt. 40-1 at 5). The Allen County Jail Commander notes that the Jail does not have an "an idea[l] layout." (Dkt. 40-1 at 86 [l. 25]).

of staff at the Jail—6 a.m. to 2 p.m., 2 p.m. to 10 p.m., and 10 p.m. to 6 a.m. (*Id.* at 17 [ll. 9-16]). Correctional staff are supposed to perform walk-throughs of the blocks every hour. (*Id.* at 27 [l. 24] – 28 [l. 7]). However, prisoners report that staff enter the blocks much less frequently than that. (Dkt. 40-7 ¶ 21 ["I see correctional officers when food is passed out. Other than that, the guards check in on us only every couple of hours at most."]; Dkt. 40-9 ¶ 11 ["Correctional officers do not perform hourly walkthroughs."]; Dkt. 40-11 ¶ 14 ["During the day, officers will actually enter the block to observe us only when meals are passed out."]); Dkt. 40-15 ¶ 11 ["correctional officers only appear infrequently on the blocks"]).

The prisoners report that frequently no correctional staff are present in the modules supervising them. *See, e.g.,*

- Dkt. 40-9 ¶ 11 ("[T]here are times when you can look through the glass to the modules where the officers are supposed to be and see that there is no one there.");

- Dkt. 40-11 ¶ 12 ("There is a module behind glass on our unit where correctional officers can directly observe the unit. However, I have observed that frequently there is not an officer in the module.");

- Declaration of Devonte Perkins, 40-13 ¶ 7 ("We can tell there are many times when there are no correctional officers in the module where they are supposed to be.");

- 40-14 ¶ 14 (noting that "correctional officers are frequently not in the control areas in the blocks);

- 40-18 ¶ 14 ("I can tell that frequently there are not guards in the modules on the unit. There is mirrored glass but if you get close to the glass and look in, you can see there is no one there.").

In fact, during the overnight shift, only three modules are staffed. (Dkt. 40-1 at 17 [ll. 16-21]). And, during the other shifts there is only one officer in each module, even the modules that observe two or more blocks. (*Id.* at 17 [l. 9] – 18 [l. 5]). Therefore, if the officer leaves the module to perform his or her duties, such as escorting prisoners off the block, conducting an inspection in a cell in one of the two modules that he or she may supervise, or for any other reason, the module

will be empty, and the other prisoners on the block will be left unattended. (Dkt. 40-1 at 52 [l. 23] – 54 [l. 25]).[10]

In 2013, William Wilson of the Indiana Sheriff's Association did a staffing survey of the Jail at the request of the then-Jail Commander. (Dkt. 40-20 at 32 [l. 25] -33 [l. 3]).[11] The purpose of a staffing analysis is to determine whether staffing has fallen to levels where the safety of prisoners and staff are in jeopardy. (*Id.* at 10 [l. 11] – 12 [l. 4]). There must be sufficient staff to operate the jail controls, complete necessary health and welfare checks, monitor prisoner areas for security and safety problems, maintain security, and properly admit and discharge prisoners. (*Id.* at 13 [l. 14] – 14 [l. 1]). Mr. Wilson took note of the challenges posed by the structure of the Jail and the need to have human eyes on prisoners:

> The physical plant affects the staff's ability to supervise and control the inmate, whether it is in his/her living unit, during a program, and/or movement within the jail. When surveillance is used, the staff's direct observation of the area is both limited and intermittent. This causes staff to lose control over their areas of responsibility and, in many cases, can cause inmates to become dependent upon other inmates for their safety rather than staff. The use of technology such as close-circuit televisions, remote locking devices and alarms may also aid staff in carrying out their duties, but should be seen as a supplement to the staff and not as a substitute.

(Ex. 7 to Dkt. 40-1 at 4).

At the time that Mr. Wilson did his survey, the Jail had 130 correctional staff persons, including the Jail Commander and Assistant Jail Commander, and Mr. Wilson based his assessment on a population at or below 741 prisoners. (Dkt. 40-20 at 23 [l. 25] – 24 [l. 3]; Ex. 7 to

---

[10]    For example, if a prisoner is on suicide watch or suicide precautions, he or she must be checked every 15 minutes, in person, by the officer who is stationed in the module on the cell blocks. (Dkt. 40-1 at 55 [l. 22] – 56 [l. 8]).

[11]    Exhibit 7 to Commander Butler's deposition and Exhibit 1 to Mr. Wilson's deposition are identical copies of the staffing analysis. The copy attached to Commander Butler's deposition will be referred to in this memorandum.

Dkt. 40-1 at 19). Mr. Wilson found that the staffing of the Jail was deficient, concluding that "the Allen County Jail does not presently have sufficient staff resource hours (man power) to patrol the jail, conduct important security operations, such as routine cell searches, and staff important areas of the Jail." (Ex. 7 to Dkt. 40-1 at 2). He specifically noted that the lack of adequate staff caused, among other things:

- daily deficiencies in the ability to control prisoner behavior
- daily deficiencies in inmate observation
- daily deficiencies in handling emergency back-up
- daily deficiencies in regulating inmate movement
- daily deficiencies in conducting random unannounced inspections
- daily deficiencies in controlling inmate contraband,
- daily deficiencies in conducting prisoner recreation.
- continuous deficiencies in providing adequate back-up for staff.
- monthly deficiencies in staff training

(*Id.* at 25). Mr. Wilson computed a need for at least 171 correctional staff (not including a mental health counselor). (*Id.* at 18).

At the current time, the Jail has 137 correctional officers, including the Jail Commander and Assistant Commander. (Dkt. 40-1 at 48 [ll.5-16]). The Jail Commander agrees that at the current time to protect the prisoners and staff, the Jail requires at least the staff number recommended by Mr. Wilson. (*Id.* at 59 [ll. 14-24]). However, the Sheriff wisely wishes to always have two officers in each cell block module, which would require roughly 201 correctional staff. (*Id.* at 49 [ll. 9-13]). Dr. Kiekbusch did a more detailed calculation, placing two officers in each module, and came up with a figure of 227 jail officers needed, including the Jail Commander and Assistant Commander. (Ex. 1 to Dkt. 40-3 at 5-9). Having two officers in each module would mean "that the cell blocks attached to each module are never left unsupervised when one of the officers leaves the module for some reason." (*Id.* at 8).

Regardless of the actual number needed, the Jail Commander agreed with most of Mr.

11

Wilson's 2013 assessment as to the consequences of the staffing shortages. (Dkt. 40-1 at 50 [l. 18] – 51 [l. 10]). Specifically, the Commander, as the Sheriff's designate, agreed that the lack of staffing in the Jail currently causes:

- daily deficiencies in controlling inmate behavior;
- daily deficiencies in observing prisoners;
- daily deficiencies in handling emergency backup;
- daily deficiencies in regulating prisoner movement;
- daily problems in controlling inmate contraband;
- daily deficiencies in providing recreation;
- continuous problems in providing adequate back-up for staff; and
- monthly problems in providing staff training.

(*Id.*).

## IV.     The Jail's physical plant

Nearly a third of the Jail's beds are in the portion of the Jail built 40 years ago. (*Supra* at 2). The Jail Commander notes that this portion of the Jail is showing its age, with rotting and bursting pipes and sewer backups. (Dkt. 40-1 at 72 [l. 13] – 73 [l. 6]). In this portion of the Jail, the design of the pipes makes it easy for prisoners to intentionally block them, causing flooding. (*Id.* at 73 [l.14] – 74 [l. 4]). Leaks in the roof have been a problem on the many sections that link the various additions of the Jail. (*Id.* at 72 [ll. 19- 23]).

## V.     Ongoing problems caused by overcrowding and inadequate supervision at the Jail

### A.     Frequent violence in the Jail

The Jail Commander testified that the overcrowded conditions in the Jail, leading to persons sleeping on the floor and more prisoners in the day room than the areas were designed for, increase the tension that leads to prisoners violently confronting each other. (*Id.* at 68 [l. 22] – 69 [l. 2]). Numerous prisoners attest to the fact that three persons being crammed into a small two-person cell, with one person sleeping by the toilet, naturally raises tensions and violence between prisoners is common. *See, e.g.,*

- Dkt. 40-6 ¶¶ 7, 8 (noting that the cells are small for two people, let alone three, and that "[p]ersons are territorial and the crush of people cause[s] a great deal of tension");

- Dkt. 40-7 ¶¶ 18-19, 21 (stating that he was assaulted and that he hears other prisoners fighting and pointing out that the overcrowding clearly causes tension as the "prisoners live in an environment where we are packed in so tightly that if one person wants to stand up, the other person has to sit down. The person on the floor is right by the toilet. This promotes all sorts of problems.");

- Dkt. 40-8 ¶ 8 ("People fight over seating at the tables in the area outside the cells as there is not room for persons to sit.")[12];

- Dkt. 40-9 ¶¶ 7-9 (noting that the overcrowding causes tension and fights and stating that it is dangerous to be on the floor in that it is easy to be stepped on, that his cellmate has fallen on him, and that "[t]here simply is no space");

- Dkt. 40-10 ¶¶ 6-8 (commenting on being kicked while being housed on the cell floor and having items dropped on him, and the fact that when one of his cellmates goes to the bathroom, his head is very close to the toilet. As a protective custody prisoner, he must spend most of the day in the cell and will shove his boat under the bunk to get it out of the way, but then he has nowhere to sit so he sometimes sits on a bucket in the cell, and all of this causes a great deal of tension.);

- Dkt. 40-11 ¶¶ 9, 10 ("We are crammed into extremely small living spaces. It is easy to step on the prisoner who must sleep on the floor, and it is easy to collide with other prisoners as you attempt to move around the cramped cells and the cramped area outside the cells. This leads to tension and tempers flare. I have seen fights that I believe are caused by overcrowding.");

- Dkt. 40-12 ¶ 7 (fights cannot be avoided as the overcrowding causes all sorts of tension, friction, and problems, such as the risk of being stepped on in the cells, and the fact that at meals there are not enough spaces at the tables);

- Dkt. 40-13 ¶¶ 4-6 (The cells are small and the prisoners on the floor are stepped on and the person on the floor is crammed near the toilet. All of this causes a great deal of tension and fights frequently occur.);

- Dkt. 40-14 ¶¶ 7-8, 11, 13 (Overcrowding causes tension because there are too many people in too small a space and noting further that being on the floor places the prisoner right by the toilet, which is difficult. Conflicts arise because there are not enough seats at the tables for prisoners, He was attacked by a number of prisoners);

- Dkt. 40-15 ¶¶ 7-10 (He has seen fights because of crowding where people bump into each

---

[12]    This is exacerbated by the fact that prisoners who are released to the day areas for meals are not allowed to go back to their cells during meals. (Dkt. 40-8 ¶ 8).

other and tempers flare. He has seen prisoners receive black eyes, a bloody mouth, and a busted lip. The overcrowding makes persons ready to fight. He is also aware of prisoners on the floor being stepped on and having a cellmate fall on them.);

- Dkt. 40-16 ¶¶ 7-8, 14 (The overcrowding causes tension that results in fighting. He was stepped on while he was on the floor and was attacked by a prisoner.).

- Dkt. 40-17 ¶ 10 (He had his jaw fractured in a fight.).

The Jail Commander agrees that physical injuries from prisoner confrontations with each other increase along with increases in the Jail's population. (Dkt. 40-1 at 69 [ll. 20-23]). Dr. Kiekbusch concurs, stating that:

> in my experience crowding in cells inevitably heightens tension between prisoners. If a person is required to be on the floor as the third person in a two-person cell it is to be expected that they will be stepped on or have things fall on them and it is expected that they will suffer various indignities by being close to the toilet. This obviously will raise tensions. And it is to be expected that as three people attempt to navigate a small space conflicts will arise. And, in my experience, and as noted by Jail Commander Butler in his deposition that I reviewed, these conflicts will, not infrequently, turn violent.

(Dkt. 40-3 ¶ 7).

Prisoners will also fight with staff. (Dkt. 40-1 at 69 [l. 24] – 70 [l. 2]). Unfortunately, there is a direct correlation between these violent conflicts and the Jail's increased population. (*Id.* at 70 [ll. 3-6]). As population and tensions rise, there are increased assaults on staff. (*Id.*).

The Jail recorded 40 prisoners being taken to the hospital in 2020 because of violence with each other, with more being treated in the Jail without hospitalizations. (Dkt. 40-1 at 69 [ll. 3-12]). The Jail is hampered in its ability to quickly respond to fights, as even if the single officer in the module observes the fight—which is not a given—he or she will not enter the block until another staff person arrives. (*Id.* at 70 [l. 19] – 71 [l. 9]). This may take time as the staff will have to come from elsewhere in the multi-story building. (*Id.*).

However, the Jail Commander candidly admitted that staff may never know about the

14

violence among prisoners. (*Id.* 51 [l. 22] – 52 [l. 6]). Numerous prisoners attest to the fact that prisoner-on-prisoner violence occurs extremely frequently without correctional officers learning about it. (Dkt. 40-6 ¶ 21; Dkt. 40-8 ¶ 10; Dkt. 40-9 ¶ 10; Dkt. 40-10 ¶ 8; Dkt. 40-11 ¶ 11; Dkt. 40-14 ¶ 14; Dkt. 40-16 ¶ 12; Dkt. 40-17 ¶ 6; Dkt. 40-18 ¶ 11). Either the guards are not present to observe the violence, or it takes place in the numerous areas in the cell blocks that are not seen by cameras. (Dkt. 40-14 ¶ 14).[13] None of this is surprising given that the staffing deficiencies in the Jail mean that direct supervision is simply impossible. (Dkt. 40-20 at 27 [ll. 10-15]). This also means that when prisoners are at risk of physical harm, they are unable to attract the attention of guards to intervene in advance. (Dkt. 40-8 ¶ 11) (the prisoner has witnessed prisoners fearful of suffering physical harm pound on their doors for more than an hour trying to gain the attention of the guards).

The bottom line is that "[t]here are too many prisoners on the block[s], and this leads to frequent fights." (Dkt. 40-8 ¶ 8). But, as one prisoner noted, "[i]f the guards were more frequently on the units, it would help defuse the tension that is always there because of how crowded it is." (Dkt. 15 ¶ 12).

B.     **The lack of recreation in the Jail**

The overcrowding in the Jail leads to continuous and unrelenting tension. (*Supra* at 12-14; Ex. 1 to 40-3 at 2) (Dr. Kiekbusch referring to crowding exacerbating, among other things, the heightened tension in the inmate population). Recreation is one way of temporarily defusing that tension, as recognized by the Jail Commander, since there is a direct correlation between the provision of recreation and the reduction of violence among inmates. (Dkt. 40-1 at 59 [ll. 18-21]).

---

[13]     When prisoners are allowed out of their cells their cell doors are open and they may access their cells. (Dkt. 40-1 at 28 [l. 14] – 29 [l. 6]). As previously noted, most cells are out of the view of cameras. (*Supra* at 3-4).

This ability to "blow off steam" is necessary for both physical and mental health. (*Id.* at 59 [l. 23] – 60 [l. 2]). Dr. Kiekbusch notes that:

> It is incumbent upon those in charge of our jails to provide regular outlets for inmates confined in these conditions. In most jail facilities recreation is the primary, if not the only, outlet available. The absence of regular recreational opportunities, opportunities for inmates to "let off steam" and "get away from it all" for a short time, often leads to escalated tension in the inmate population and an increased frequency of inmate/inmate and inmate/staff physical confrontations. In other words, the absence of adequate inmate recreational opportunities often severely compromises institutional safety.

(Ex. 1 to Dkt 40-3 at 9]).

As previously indicated, at this point no recreation is being offered because of pandemic restrictions. (*Supra* at 7). As also noted, due to the overcrowded conditions on the blocks, it is difficult if not impossible for prisoners to engage in vigorous physical exercise in the day rooms. (*Id.*). Dr. Kiekbusch states that in his experience the necessary vigorous physical activity cannot occur in overcrowded dayrooms. (Dkt. 40-3 ¶ 10).

But even prior to the pandemic, prisoners were offered recreation for only one hour a week, at best. (*Id.* at 60 [ll. 9-14]; Dkt. 40-7 ¶ 28 [noting that before the pandemic he was offered recreation, at most, twice a month]). The Jail Commander conceded that prisoners should receive more than one hour a week of recreation outside of their cell areas and that daily recreation would be ideal. (Dkt. 40-1 at 61 [ll. 9-14]). Mr. Wilson stated that jails should offer at least four hours a week of exercise in a separate recreation area. (Dkt. 40-20 at 31 [l. 7] – 32 [l. 5]). Dr. Kiekbusch notes that current standards of the American Correctional Association for local detention facilities require that prisoners receive at least one hour of recreation each day. (Dkt. 40-3 ¶ 10).

## C.    The inability of staff to respond to emergencies

Insufficient staffing leads not only to excessive violence by the prisoners, but also to the inability of staff to respond to emergencies. Again, in most of the blocks for at least the late shift,

there is no one in the module watching the block. (Dkt. 40-1 at 17 [ll. 16-21]). And, even if there is an officer assigned to the module, he or she may be elsewhere at any given time. (*See supra* at 8-10). It is essential to assure the safety of both prisoners and staff that there be two officers in each module observing the block so that officers can notice and respond to both emergency and non-emergency events without leaving the block unattended and without direct supervision, as it is extremely dangerous to do so. (Dkt. 40-3 ¶ 8). Without an officer supervising the block, things can happen of which the staff is not immediately aware, and when there are urgent situations or emergencies, prisoners in the majority of the blocks must resort to kicking or banging on their doors or yelling to attract someone's attention, as the majority of blocks do not have a call button or intercom system.  (Dkt. 40-1 at 28 [ll.8-13]; Dkt. 40- 7 ¶¶ 23-23; Dkt. 40-8 ¶ 11; Dkt. 40-10 ¶ 9; Dkt. 40-11 ¶ 13; Dkt. 40-13 ¶ 9; 40-14 ¶ 15; 40-15 ¶ 14). But despite the necessity of this form of communication, prisoners' attempts to attract staff attention have resulted in prisoners being disciplined for making too much noise. (Dkt. 40-7 ¶ 22; 40-14 ¶ 15; 40-15 ¶ 14). Prisoners who are in the minority of cells with call buttons may not get a prompt response even when they press them. (40-9 ¶ 13; Dkt. 40-13 ¶ 9).[14]

Numerous prisoners attest to the serious problems that have occurred because of this lack of attention.

- Dkt. 40-18 ¶ 15 (A prisoner had a medical issue, presumably a heart attack, which proved fatal. Although prisoners kicked on their doors to attract staff attention, it nonetheless took them 15 minutes to respond.).

- Dkt. 40-10 ¶ 9 (Prisoner were required to bang on their doors to get attention for a prisoner who appeared to be having a stroke or seizure, and it took a full 30 minutes for correctional

---

[14]    The need to respond to emergencies and the lack of staff leads to what Mr. Wilson referred to as "rob[bing] Peter to pay Paul. So we take somebody from this post to go here and deal with the problem here. Now we have this post that is not being properly manned." (Dkt. 40- 20 at 27 [ll. 17-20]). Having two officers in each module, which would, as noted above, require a marked increase in staff, would remedy this problem. (Ex. 1 to Dkt. 40-3 at 8).

officers to appear.).

- Dk. 40-15 ¶¶ 14 (He is aware of separate incidents of prisoners having heart attacks and seizures and fellow prisoners needing to kick their doors for 10-15 minutes in one instance and an hour in another before there was a response, which included punishment for kicking on the doors.).

- Dkt. 40-9 ¶ 13 (A prisoner appeared to be having an allergic reaction and was vomiting, but it took 20-30 minutes, with prisoners banging on their doors, for correctional staff to appear.).

- Dkt. 40-7 ¶ 24 (A prisoner fell in his cell and suffered a head injury, and it took an hour for staff to come, despite prisoners' efforts to attract staff attention.).

- Dkt. 40-9 ¶ 13 (There are monthly medical emergencies about which prisoners push their call buttons, but it routinely takes an hour or more to receive a response).

- Dkt. 40-5 ¶ 10 (Prisoners have needed attention because of heart attacks or suicide attempts, causing fellow prisoners to bang on doors and push intercom buttons, only to have officers arrive more than an hour later.

- Dkt. 40-17 ¶¶ 7, 10 (An elderly prisoner fell down the stairs and there was no help from staff and the prisoners had to help him. And the declarant had his jaw fractured during the first shift and had to wait until 5 p.m. for help.).[15]

### D.    Other serious safety and habitability concerns in the Jail

The overcrowded conditions lead to tension and violence. However, not to be overlooked are the general habitability problems and dangers caused by requiring a significant percentage of prisoners to sleep on "dirty and cluttered" floors, (Dkt. 40-5 ¶ 6), near toilets that must be used by all three prisoners in the cell. (Dkt. 40-10 ¶ 6 ["When my cell mates go to the bathroom, my head is very close to the toilet."]). Aside from causing violent reactions, this is disgusting. (Dkt. 40-17 ¶ 4). And, as noted, prisoners on the floor are subject to being stepped on, kicked, or even fallen upon, as well as having items dropped on them. (Dkt. 40-9 ¶ 7; Dkt. 40-10 ¶ 6; Dkt. 40-13 ¶ 5; 40-

---

[15]    In 2020 there were three suicides in the Jail, all among prisoners who were not thought to be suicidal. (Ex, 40-1 at 67 [l. 4] – 68 [l. 6]). It is not clear what affect staffing shortages had on their deaths.

15 ¶ 9). Moreover, it is physically uncomfortable to be on the floor. (Dkt. 40-16 ¶ 9 ["I have a hip disorder and it was painful to be on the floor."]).

The overcrowded conditions and lack of staff not only cause difficulties in responding to emergencies, but also cause problems in responding to less emergent, but nonetheless serious concerns in the cells. For example, three prisoners were housed in one of the two-person cells in M block in December of 2020 when the weld broke on the cell's bunk bed so that one end of the bed separated, and increasingly pulled away from the wall. (Dkt. 40-7 ¶ 26). The prisoner sleeping on the top bunk immediately complained, but the bed was never repaired, and it took the Jail two months to move the prisoners to another location. (*Id.* ¶ 27). In the meantime, the prisoner had to continue to sleep on the top bunk, as it pulled away from the wall, because there was nowhere else to sleep. (*Id.* ¶ 26). To attempt to prevent the bed from separating from the wall completely and collapsing, he tried to curl up on the end of the bed that was still welded to the wall. (*Id.*).

Prisoners note that delivery of food is inevitably delayed so that by the time guards pass out meals, food that is supposed to be hot is cold. (Dkt. 40-7 ¶ 28; Dkt. 40-8 ¶ 12; Dkt. 40-9 ¶ 12; Dkt. 40-16 ¶ 17; Dkt. 40-17 ¶ 8). Sometimes it takes an hour for food to be distributed after it is received at the cell block. (Dkt. 40-17 ¶ 8). The delay in food delivery is not a surprise given that overcrowding in a jail exacerbates all other problems in the jail environment, causing delays in food service. (Ex. 1 to 40-3 at 2). Indeed, the Jail Commander conceded that overcrowding affects the ability to prepare and deliver food to prisoners in a timely manner and that when the population exceeds 800 there can be delays. (Dkt. 40-1 at 76 [ll. 4-18]).

## E.    Contraband in the Jail

William Wilson's staffing survey noted that with just seven fewer correctional staff persons than are currently employed, and assuming that the Jail population was at or below its capacity,

(Dkt. 40-20 at 23 [l. 25] – 24 [l. 3])—significantly below the current population—the Jail had daily deficiencies in controlling contraband. (Ex. 7 to 40-1 at 25).[16] The Jail Commander agreed that this observation still describes the situation at the Jail today. (Dkt. 40-1 at 50 [l. 18] – 51 [l. 9]). At the current time, a minimum of three cells are randomly searched on each shift, although this has not always been the case during the time of COVID. (Dkt. 40-1 at 54 [ll. 6-23]). Cell searches are done by two officers, so this requires an officer from another location to be called in to assist. (*Id.*). The Jail Commander indicated that although the staffing deficiencies do not prevent these minimal searches for contraband, ideally more searches should occur, as the possession of contraband is a continuing problem in the Jail. (*Id.* at 57 [ll. 7-17]). More staff would be necessary to conduct more searches. (*Id.*).

Prisoners confirm the Jail Commander's assessment that contraband is a problem in the Jail. The possession of unlawful drugs within the Jail is widespread and pervasive. (Dkt. 40-7 ¶ 30). Drug use is so rampant, and supervision is so lax, that a prisoner notes that he often smells drugs as they are smoked by prisoners and the smoke travels through the Jail's air vents. (*Id.*).

F.   **Classification issues**

In a jail there is a "critically important need to assign inmates to housing units that are consistent with their respective classifications." (Ex. 1 to Dkt. 40-3 at 1). The Jail Commander indicated in December 2020 that the Jail classifies prisoners and generally puts them in appropriate blocks, even if this means that prisoners must be housed on the floor in those blocks. (Dkt. 40-1 at 42 [l. 9] – 43 [l. 15]).

---

[16]   The Allen County Jail rules define "contraband" as "anything forbidden by State or Federal Law." (Dkt. 40-19 at 3 ¶ 13, produced in response to First Set of Discovery Requests to Defendant Sheriff of Allen County). However, prisoners are also not allowed to possess any item prohibited by the Jail Commander, which "include[s] anything not issued by the Jail, sold by the Commissary, or defined in the "Inmate-Allowed Possession" section of these rules." (*Id.* ¶ 14).

However, more recent sworn statements from prisoners recount what appear to be examples of incorrect or deficient classification. Not only are prisoners who are charged with non-violent offenses and misdemeanors placed with those charged with violent offenses, including homicide, but prisoners who are obviously mentally ill are also placed on these blocks. (Dkt. 40-6 ¶ 11; 40-9 ¶ 16;, 40-11 ¶ 15; 40-12 ¶ 9; 40-13 ¶ 10; Dkt. 40-17 ¶ 10; Dkt. 40-18 ¶ 16). This leads to vulnerable prisoners being preyed upon by others. (Dkt. 40- 11 ¶ 15; 40-18 ¶ 16). One prisoner noted that an individual on his block had a colostomy pouching system and should have been placed in the medical block for proper care and safety. (Dkt. 40-9 ¶ 16). Another prisoner was assaulted by an inmate during a previous stay, but no attempt was made to separate those two inmates when they were both in the Jail again recently—even though the assaultive inmate renewed his threats and demanded that the two go into a cell where they could fight away from cameras. (Dkt. 40-7 ¶ 15). This just increases the conflicts on the blocks. (40-11 ¶ 15).

## VI.    The reaction of the County to the problems at the Jail

At this point, the stakeholders in the criminal justice system in Allen County— the state courts, prosecutor, community corrections, and sheriff's department—all believe that they have done everything possible to try to reduce the population of the Allen County Jail. (Deposition of Chris Cloud, Dkt. 40-21 at 10 [l. 6] – 13 [l. 23]).[17]  In 2020 Elevatus produced a proposal containing

---

[17]    Mr. Cloud is the chief of staff for the Allen County Commissioners and appeared at the deposition as the designate of the Commissioners. (Dkt. 40-21 at 5 [ll. 7-13]).

After the deposition, the County Commissioners voted to terminate the contract with the United States Marshal's office, effective September1, 2021, under which it reserves approximately 60 beds for use by the Marshal's Service. (Dkt. 40-23 [Board of Commissioners of the County of Allen, Minutes, July 2, 2021, available through http://www.allencountyindiana.org/agenda (last visited Aug. 16, 2021)]); Dkt. 40-1 at 33 [l. 21] – 34 [l. 5]). This will free up these beds but will not resolve the overcrowding of the Jail. Indeed, the representative of the County Commissioners noted that cancelling the contract "would not get us below daily rated capacity number of 741." (Dkt. 40-21 at 14 [l. 24] -15 [l. 9]).

several options to create a new 6E block on the Jail's fourth floor and expand 6F block, to add more permanent beds. (Dkt. 40-1 at 85 [l. 1] – 88[l. 16]). The option preferred by the Jail Commander would add 309 beds. (*Id.* at 89 [ll. 3-14]; Ex. 9 to Dkt. 40-1). However, given the population pressures on the Jail, the Jail Commander acknowledged that even adding this number of beds would do little to get the Jail below the population level at which it is overcrowded. (Dkt. 40-1 at 90 [ll. 14-23]).  In its study of the Allen County criminal justice system, commissioned by the County Commissioners, Elevatus also concluded that given the need to stay at or below 80% of capacity, adding on to the existing Jail is simply not a viable option, as by the conclusion of the two-year construction project, the Jail's projected population would already exceed 80% of that expanded capacity. (Dkt. 40-2 at 8 [ll. 8-12]; Ex. 2 to Dkt. 40-2 at 5). Instead, given the Jail's current population and its projected future population, the Elevatus study "recommend[s] the county pursue the construction of a new jail on a site to be determined." (*Id.* at 6).[18]

## Argument

### I.    Legal standards applying to Eighth and Fourteenth Amendment Claims

Two different provisions of the Constitution are implicated in the instant suit, as the due process clause of the Fourteenth Amendment governs claims for unconstitutional conditions of confinement brought by pretrial detainees, while the Eighth Amendment governs claims for

---

[18]    Even before the Elevatus study, both the County Commissioners and County Council were aware of the population difficulties at the Jail. The President of the Council stated that the Council was aware that the Jail is chronically overcrowded (Deposition of County Council President Kerley, Dkt. 40-22 at 11[ll. 13-15]). And the representative of the County Commissioners noted that the Commissioners agreed that the population of the Jail is a problem that needs to be addressed. (Dkt. 40-21 at 19 [ll. 9-12]).

The Jail Commander's preference is for a new facility, as "[w]e are in an aging building that has been added onto three separate times from the original one. It is not an idea[l] layout. You know, the facility depending on what part you are in and the different sections, it is not the nicest for even inmates to be in. There is a laundry list of reasons why." (Dkt. 40-1 at 86 [l. 23] – 87 [l. 4]).

convicted prisoners. *See Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015); *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). Both pretrial detainees and post-conviction prisoners are held within the Allen County Jail.  (*See, e.g.,* 40-4 at 6-7 [breaking out the number of prisoners who are pre-trial and who have been sentenced]). To demonstrate a violation of the Eighth Amendment, a convicted prisoner must show: (1) an objective component—that he was denied "the minimal civilized measure of life's necessities," creating an excessive risk to his health or safety; and (2) a subjective component—that the defendants were deliberately indifferent to a substantial risk of serious harm to the prisoner from those conditions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Seventh Circuit has held, following *Kingsley v. Hendrickson,* 576 U.S. 389 (2015), that the claims of pretrial detainees, including conditions-of-confinement claims, need satisfy only the objective component noted above. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).

While the difference between the two standards may be relevant in certain contexts, it is of no matter here. There is no question that the Sheriff and County have actual knowledge of the conditions in the Jail, and therefore the only question is whether the Jail's conditions deny prisoners the minimal civilized measures of life's necessities.

## II. Plaintiffs have been denied the minimal civilized measure of life's necessities, resulting in substantial risks to their health and safety

Prison officials "have a responsibility to provide inmates with a minima of shelter, sanitation and utilities—basic necessities of civilized life."  *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989). In evaluating whether jail conditions meet this minimum standard, courts look to elements such as whether cells are holding more individuals than they are designed for, including whether inmates are required to sleep on the floor; physical plant deficiencies such as inadequate plumbing or ventilation; the provision of adequate food and medical care; and physical safety. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *see also James v. Milwaukee Cnty.*, 956 F.2d

696, 699 (7th Cir. 1992) (the Eighth Amendment is triggered by "deprivations of basic human needs like food, medical care, sanitation, and physical safety"). In determining whether a denial of basic human needs has occurred, a court considers "the totality of the conditions of confinement." *French v. Owens*, 777 F.2d 1250, 1252-53 (7th Cir. 1985). Even if a condition of confinement is not "individually serious enough" to rise to the level of a constitutional violation, conditions "may violate the Constitution in combination when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Budd*, 711 F.3d at 842 (internal quotation and citation omitted).

### A.    The risk of violence caused by the overcrowding is a constitutional violation

Under the Fourteenth and Eighth Amendments, "[j]ail officials have a duty to protect inmates from violent assaults by other inmates." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 833). But overcrowded conditions often lead to increased tension and violence among inmates, as they are forced to coexist in cells and housing units that are pushed beyond their capacity. This puts all prisoners at a substantial risk of violence. *See Rhodes*, 452 U.S. at 348 (Overcrowding may violate the Eighth Amendment where it leads to "increased violence among inmates."); *Webb v. Deboo*, 423 Fed. App'x 299, 301 (4th Cir. 2011) (finding prisoner stated Eighth Amendment claim where overcrowding was causing, among other things, "an increased risk of violence").

The facts are clear that defendants are failing to meet their duty, imposed by the Constitution, to protect the prisoners from actual violence and the threat of violence. As testimony from the Jail Commander and declarations from the prisoners confirm, overcrowding and increased violence go hand-in-hand at the Jail. Violence, both that identified by correctional officers and that unseen by them, is a frequent and regular feature of life in the Jail. And,

significantly, the Jail Commander acknowledges that physical injuries from prisoner confrontations with each other increase along with the Jail's population. (*Supra* at 14). The bottom line is the prisoners are subjected to actual violence as well as a heightened risk of violence that result directly from the overcrowding and the understaffing of the Jail.  This is unconstitutional even without considering the other deficiencies in the Jail.

**B.    The lack of staff is a factor that contributes to the Jail being unable to provide the basic necessities of life to the prisoners and is unconstitutional**

The Jail is profoundly, and dangerously, understaffed. William Wilson's 2013 staffing survey identified the need for 171 correctional staff (not including the mental health counselor) "to insure that inmate supervision and control is maintained constantly and both the jail officers and inmates are afforded safe and secure conditions." (Ex. 7 to Dkt. 40-1 at 18, 29). However, Mr. Wilson indicated that he would defer to the Jail Commander's estimate of what was necessary to assure safety, and the Jail Commander indicated that to have two officers in each module it would be necessary to have, as a rough estimate, 201 officers. (*Supra* at 11).[19] It is essential for safety reasons to have two officers present in the modules. (*Supra* at 17). At the current time the Jail has only 137 jail officers (including the Jail Commander and Assistant Commander). This is 80% of the figure noted in the staffing survey, 68% of the figure given by the Jail Commander, and 60% of the figure computed by Dr. Kiekbusch—and at least as to Mr. Wilson's staffing estimate, based upon an even lower population than exists in the Jail today. Regardless of what number one uses as the target, the Jail's current staffing is woefully insufficient.

Without sufficient staffing, an overcrowded facility will inevitably lead to increased risk of violence to the prisoners. *See, e.g.*, *French*, 777 F.2d at 1251-52, 1257 (finding that "insufficient

---

[19]    Dr. Kiekbusch did a detailed analysis and came up the need for 227 correctional staff. (*Supra* at 11).

safety personnel" to cover the increased population resulted in "pervasive" violence in violation of the Eighth Amendment); *Ramos v. Lamm*, 639 F.2d 559, 573-74 (10th Cir. 1980) (finding lack of adequate staffing levels led to pervasive "violence and the fear of violence," and that the prison's deliberate indifference to the legitimate safety needs of the prison violated the Eighth Amendment); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1200 (M.D. Ala. 2017) (finding "combination of overcrowding and understaffing leads to an increased level of violence").

The uncontested facts in this case demonstrate that the above risks from the lack of sufficient staff are borne out in the Jail. The Jail Commander agrees that the staffing shortage in the Jail currently causes, among other problems, daily deficiencies in controlling inmate behavior, observing prisoners, regulating prisoner movement, controlling inmate contraband, and handling emergency backup. (*Supra* at 11-12). There are not sufficient staff to always have someone in the modules observing prisoners. It bears reemphasis that the Allen County Jail is a penal institution where, at times, inmates are simply unobserved—and where inmates *know* that they are unobserved. And even when problems occur that the correctional officers know about, they must wait to be joined by another officer before they can enter the unit.  (*Supra* at 14). Therefore, there is a constant risk of "robbing Peter to pay Paul"—taking officers from one short-staffed area to try to assist another short-staffed area.

The lack of staff, of course, has a direct impact on the levels of prisoner violence in the facility, as assaults occur with impunity because they are not noticed. Again, as Mr. Wilson has noted, "the visible presence of staff . . . has a lot to do with how inmates will actually behave." (Dkt. 40-20 at 19 [ll. 6-7]). However, it is not just violence that is affected by the lack of staffing. As many prisoners have noted, staff is not responsive in a timely fashion to emergency calls or to prisoners' other attempts to seek aid. (*Supra* at 17-18). Given the paucity of staff, the failure of the

officers to promptly respond to actual emergencies is not surprising.

Nor is it surprising that contraband is, admittedly, a problem within the Jail. Although three cells are randomly searched each day, the Jail Commander admits that the lack of staff causes a deficiency in contraband searches on a daily basis. (*Supra* at 19-20).

### C.     The conditions imposed on prisoners in their crowded cells contribute to the the denial of the minimal civilized measures of life's necessities

Prisoners are forced to live in crowded cells where the unlucky person without a bunk must sleep with his head near the toilet, with all the indignities that this entails. They are subject to being stepped on, having items dropped on them, and having a cellmate fall on them. During the times that they are locked in their cells, there is not enough room for the prisoners to exist together in the space, although they may have to eat their meals there, depending on their classification status. They are served cold food.

The question is whether the conditions in the overcrowded cells represent "serious deprivations of basic human needs." *Rhodes,* 452 U.S. at 346. In *French,* the prison nearly doubled its capacity by bunking two prisoners in cells that were originally designed for one. 777 F.2d at 1252. Overcrowding resulted in approximately 24 square feet of space per prisoner, and conditions that made the prison intolerable. *Id.*  The court agreed that the conditions contributed to a finding that the prison violated the Eighth Amendment. *Id.  See also Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013) (court found that a prisoner alleged an Eighth Amendment claim of overcrowding where he was prisoner was confined to 29-square feet in a six-person cell, and the lack of living space was exacerbated by ventilation, sanitation, and safety issues, leading to deprivation of specific life necessities); *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996) (noting as among the relevant considerations: the amount of time prisoners must spend in their cells each day, sanitation, bedding, plumbing, ventilation, noise, and opportunities for outside-of-cell activities).

Here, the overcrowding of the Allen County Jail has resulted in conditions that fall below basic standards of habitability. As in *French*, the Jail exceeds appropriate capacity levels on any given day. And as the Jail Commander and the Elevatus report have made clear, the Jail population is likely to continue to increase. Depending on the cells in which inmates are housed, those who are forced to triple-cell in spaces designed for fewer inmates are provided as little as 32 square feet per person. (*Supra* at 3). Furthermore, as in *Budd*, prisoners are forced to sleep on cell floors near the toilet, subjected to unsanitary conditions, and at risk of fellow prisoners stepping or falling on them. In the older portions of the Jail, the physical plant is showing its age, with rotting and bursting pipes, and sewer backups. And the excessive population adversely affects the timely preparation and delivery of food to inmates. These conditions fall below the minimal standards of habitability and put the prisoners' physical and mental health at risk.[20]

### D. The failure to provide the prisoners with sufficient recreation, which aggravates the tension and violence in the Jail, violates the Constitution

Lack of opportunity for out-of-cell exercise may also rise to a constitutional violation. *See Smith*, 803 F.3d at 313; *French*, 777 F.2d at 1255; *Anderson v. Romero*, 72 F.3d 518, 527-28 (7th

---

[20]    Of course, in this time of COVID, the obvious should be emphasized—the overcrowded conditions in the Jail, where three prisoners are crammed into two-person cells and where there is generally not any room in the day areas to physically separate, pose an additional risk of constitutional magnitude, insofar as they result in "an increased risk of spreading infections disease." *Ashley v. Mollenhauer*, 2013 WL 432907, at *4 (N.D. Ind. Jan. 31, 2013) (internal quotation and citation omitted); see also *Mark v. Officers Olson, Haglin, Harsma Granton's 1st, 2nd, 3rd Shift Officers Between Dates of 7-29-02, 8-13-02*, 2003 WL 23221515, at *7 (W.D. Wis. Oct. 21, 2003) ("Certainly, in some cases, the risk of harm in placing a healthy inmate in the same cell as one with a communicable disease would be significant enough to be considered cruel and unusual punishment. … if the disease was one that could be acquired simply by breathing the same air as one already infected, plaintiff would have a right to be segregated from any carriers. Finally, the risk of exposure could become intolerably high if there was severe overcrowding and unsanitary conditions at the prison.") (internal citations omitted); *see also* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* at 4 (June 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#print (recommending that facilities consider all available options to reduce overcrowding to prevent the spread of disease). Overcrowded conditions increase the risk of transmission of COVID-19 among prisoners, and also among staff who travel in and out of the facility daily.

Cir. 1995). Current norms recognize that "exercise is no longer considered an optional form of recreation, but is instead a necessary requirement for physical and mental well-being." *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001); *see also Crenshaw v. Baldwin*, 2017 WL 3189500, at *5 (S.D. Ill. July 27, 2017). In *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), for example, an inmate alleged that he had no room to exercise in his unit and at most was able to recreate outside of his cell once every two weeks for an hour at a time. *Id.* at 1432. The court found that the deprivation under these facts could put the inmate's health at risk and constitute an Eighth Amendment violation. *Id.; see also Davenport v. DeRobertis,* 653 F. Supp. 649, 654-56, 664 (N.D. Ill. 1987), *aff'd and modified*, 844 F.2d 1310 (7th Cir. 1988) (granting segregation inmates five hours of exercise per week); *Lightfoot v. Walker,* 486 F. Supp. 504, 511 (S.D. Ill. 1980) ("one shower and one hour of exercise per week...is not a medically acceptable frequency or duration of showers or exercise; it promotes deterioration of inmates physically.").

In addition to the physical health risks created by the lack of out-of-cell exercise, recreation is key to reducing the tension and other mental health consequences of incarceration, particularly in overcrowded conditions. Dr. Kiekbusch notes that "the absence of adequate inmate recreational opportunities often severely compromises institutional safety." (Ex. 1 to Dkt. 40-3 at 9]). And the Jail Commander concurs that there is a direct correlation between the provision of recreation and the prevention of prisoner violence. (*Supra* at 15). The lack of recreation affects both physical and mental health.

Prior to the pandemic the Jail attempted to provide recreation one day a week for an hour, although one prisoner has noted that he received it, at most, twice a month. Regardless, the Jail Commander agrees that once a week is not enough physical recreation and that prisoners should receive more—ideally daily. The American Correctional Association indicates that prisoners

should receive one hour of out-of-cell recreation each day. (*Supra* at 16).[21]

Perhaps the lack of vigorous exercise in the Jail's recreation areas could be excused if prisoners were able to engage in such exercise in their living areas. *See, e.g., Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1089 (7th Cir. 1986) (finding sufficient exercise possibilities where inmates had access to exercise equipment in common areas). However, the prisoners note that there simply is not room in the crowded day area (*supra* at 7), and the Jail Commander concedes that these areas become "a little crowded" for prisoners to exercise in given the number of prisoners present. (*See* Dkt. 40-1 at 62 [ll. 13-16]).

### E.    Issues surrounding classification exacerbate overcrowding and violence

The parties agree that there is a "critically important need to assign inmates to housing units that are consistent with their respective classifications." (Ex. 1 to Dkt. 40-3 at 1). The failure to adequately classify and separate prisoners may imperil the safety of other prisoners and constitute a violation of the Constitution. *See, e.g.*, *McCreary v. Parker*, 456 Fed. App'x 790, 793 (11th Cir. 2012) (finding prisoner properly raised Eighth Amendment claim where overcrowding led to inmates being improperly placed in shared cells leading to increased inmate-on-inmate violence); *Walsh v. Mellas*, 837 F.2d 789, 797-98 (7th Cir. 1988) (finding failure to screen prisoners for "proclivity for violence and/or whether they are a gang-target in the face of gang-related threats and violence manifest[ed] utter disregard for the value of human life").

The Jail Commander believes that prisoners are being classified, while the prisoners cite examples that they believe demonstrate improper classification. However, as a practical matter, it

---

[21]    "[T]he American Correctional Association is the premier organization of prison administrators and penologists in this country, if not the world, and it is not noted for exalting the rights of inmates over those of correctional authorities and the public." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 847 n.16 (D.C. Cir. 1988).

makes no difference and any dispute as to what is actually occurring is not material. On the one hand, the Jail Commander notes that the Jail's efforts to properly classify prisoners results in prisoners being placed on the floor in what the Jail deems to be the proper blocks, because there simply is not room in the Jail to house them on bunks in the appropriate units. (Dkt. 40-1 at 35 [l. 2] – 36 [l. 23]). It is conceded that this overcrowding inevitably leads to violence. On the other hand, if inmates are placed in units that have sufficient space, but are inappropriate from a classification perspective, that "negatively affects institutional security and safety." (Ex. 1 to Dkt. 40-3 at 2). Either path leads to violence, and either way the Constitution is violated.

**F.    Conclusion**

The Allen County Jail is a dangerous and unpleasant place. This stems from overcrowding, lack of staff, and problems with the physical structure and condition of the Jail itself. These problems, in turn, generate a host of offending conditions: violence; prisoners forced to sleep on floors where they are exposed to accidental harm from their fellow prisoners; unsanitary conditions; unrelenting tension engendered by the overcrowding; and injury to both mental and physical health due to lack of recreation. All of this results in a denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 837. The County and Sheriff are aware of and agree that dangerous conditions abide in the Jail and agree that the County's retained expert has recommended that a new Jail be built. Nonetheless, the constitutional deficiencies remain, in violation of the Fourteenth and Eighth Amendments.

**III.    The Court should enter specific relief, within the constraints imposed by the Prison Litigation Reform Act, to require the County to cure the Jail's constitutional deficiencies**

To start, the plaintiff-class is entitled to a declaration that their Eighth and Fourteenth Amendment rights are violated by conditions existing in the Jail, that these conditions existed on

the day that this litigation was filed, and that they continue to the present. The next question concerns the appropriate injunctive relief given the limitations imposed by the Prison Litigation Reform Act ("PLRA"). *See* 18 U.S.C. § 3626.

When prison officials disregard the Eighth Amendment, "judicial intervention is *indispensable.*" *Rhodes,* 452 U.S. at 354 (emphasis in original). "This is particularly true in cases where, as here, inmates have demonstrated gross and systemic inadequacies in policies and practices that place the health and safety of all inmates at substantial risk." *Ginest v. Bd. of Cty. Comm'rs of Carbon Cty.*, 333 F. Supp. 2d 1190, 1209 (D. Wyo. 2004) (citing *Hutto v. Finney*, 437 U.S. 678, 687 n. 9 (1978) (holding that federal courts must "bring an ongoing violation [of the Eighth Amendment] to an immediate halt")).

The evidence demonstrates that the current Jail facility cannot be renovated or altered to bring it into compliance with constitutional demands. Therefore, the only feasible option is for the County to build a new Jail.  It would be reasonable for the plaintiffs to request an order requiring the County to build a new jail. But, under the PLRA, this Court cannot order the County to build a new facility. 18 U.S.C. § 3626(a)(1)(C).[22] Given the fact that overcrowding increases the danger to the health and safety of prisoners, it would also be reasonable for the plaintiffs to request that the Court impose a population cap on the existing Jail, such that the inmate population could not exceed 80% to 85% of its rated capacity—above which it is agreed by all that the Jail is dangerously overcrowded. But the PLRA also prohibits such an order, at least at this juncture. 18 U.S.C. § 3626(a)(3)(A).

But the PLRA does not deprive the plaintiffs and the Court of all remedies. The statute

---

[22]    "Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts." *Id.*

permits prospective injunctive relief that:

> extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). Injunctive relief here can easily be tailored to meet the PLRA's requirements that relief be narrowly constructed and intrude no further than necessary, while still addressing the need to remedy the constitutional deficiencies in the Jail.

The injunctive relief necessary and appropriate here falls into two categories: (1) a long-term solution—relief oriented to a permanent solution to the constitutional difficulties besetting the Jail, and (2) a short-term solution—relief aimed at ameliorating the unconstitutional conditions currently prevailing in the Jail to the greatest extent possible while a permanent solution is implemented.

### A.    Injunctive relief addressed to a long-term solution

For the long-term relief, the defendants should be ordered, within 60 days of this Court's Judgment, to file with the Court a plan to address and resolve, on a permanent basis, each of the constitutional violations found by the Court to be present in the Allen County Jail. Following the filing of the plan, plaintiffs should be given thirty days to respond to it. Once the plan is approved by the Court or otherwise adopted by the defendants, this Court should order the Sheriff and a non-counsel representative of Allen County to appear personally before the Court on dates set by the Court, approximately 30 days apart, to report on the progress in implementing the permanent solution arrived at by the defendants.

If defendants choose to resolve the Jail's constitutional deficiencies through construction of a new facility or through other construction efforts, at least seven days prior to each hearing,

the defendants should be ordered to submit reports, in writing, detailing the anticipated dates that relevant construction benchmarks will be met, and updates including any and all documents submitted by architects, contractors, consultants, construction managers or other knowledgeable persons that detail these dates. When a solution has been selected, the defendants should also submit a report detailing: the population capacity of the facility once construction is completed and the staffing numbers that will be necessary in the new jail and how those numbers were determined.

### B.    Injunctive relief addressed to a short-term solution

The Court should also order the defendants, within 60 days of this Court's Judgment, to submit its plan to address, to the greatest extent possible, the constitutional deficiencies found by the Court to currently exist in the Allen County Jail including, but not limited to, overcrowding, lack of staffing, lack of recreation, and prisoner supervision. Among other things, the plan must address the steps that defendants will be taking to provide prisoners at least three hours of recreation each week outside of their immediate cell areas. It must also address the steps that defendants will take to commit sufficient staff to provide this minimal level of recreation and to commit sufficient staff to make sure that the health and safety of prisoners is safeguarded.  The plan must specify the number of staff necessary to comply with the above injunctive relief, and how and when the new staff will be added.

Such an order satisfies the demands of 18 U.S.C. § 3626(a)(1), in that it is narrowly drawn and extends no further than necessary and represents the least intrusive means necessary to correct the violations of the constitutional rights in question. It also "preserve[s] significant administrative discretion and flexibility for prison officials." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012). The plaintiffs should be given thirty days to respond to this plan with the Court thereafter issuing,

if necessary, further injunctive relief.

Because it will take time for the defendants to implement their chosen long-term relief and to determine if any short-term changes adequately address, to the extent possible, ongoing constitutional violations in the Jail, the Court should retain continuing jurisdiction over this action. Such continuing jurisdiction should end once a new facility is opened and there is agreement that constitutional requirements are satisfied.

### C.    Plaintiffs' ability to seek further injunctive relief

If the above steps do not prove successful, either in providing long-term or short-term solutions to the unconstitutional conditions in the Jail, the prisoners may assert the need for more aggressive and intrusive relief. Other injunctive relief can be ordered if the above narrowly drawn relief is not successful in resolving the constitutional deficiencies. 18 U.S.C. § 3626(a)(1)(A) (limiting prospective relief to that which extends no further than necessary to correct the constitutional violation). As a last resort, when less intrusive relief is not successful in remedying the unconstitutional conditions, the PLRA provides a mechanism for orders to be entered that limit a facility's population or that require prisoner discharge. 18 U.S.C. § 3626(a)(3). Hopefully, these further steps will not prove necessary.

### Conclusion

There are no contested issues of material fact in this case. The prisoners are entitled to summary judgment, granting them declaratory relief that conditions at the Allen County Jail violate the constitutional requirements imposed by the Eighth and Fourteenth Amendments. They are also entitled to appropriate injunctive relief, as outlined above, within the strictures imposed by the Prison Litigation Reform Act.

Kenneth J. Falk
Stevie J. Pactor

ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org

Samuel L. Bolinger
803 S. Calhoun St.
Suite 300
Fort Wayne, IN 46802
260/407-0040
mark@slblawfirm.org

Attorneys for Plaintiff and the
Certified Class