UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

VINCENT MORRIS, on his own behalf and on
behalf of a class of those similarly situated,

Plaintiffs,

v.

SHERIFF OF ALLEN COUNTY *et al.*,

Defendants.

CAUSE NO. 1:20-CV-34 DRL

OPINION & ORDER

This class action lawsuit—for all persons currently confined, or who in the future will be confined, in the Allen County Jail—contends that the jail's conditions violate the Eighth and Fourteenth Amendments to the United States Constitution. The class says the jail is chronically overcrowded and understaffed, leading to a host of harms in safety, processing, recreation, and care of inmates. The class argues that the Allen County Sheriff has not discharged his duty to care properly for the inmates housed there, and that the Allen County Board of Commissioners has not met its statutory duty to maintain a suitable jail. Today the court must decide whether to enter summary judgment for the class and grant a permanent injunction against Sheriff David Gladieux and the Allen County Board of Commissioners to address the jail's conditions. The court does just that—to counter an overcrowding inmate population of some years and the jail's myriad other limitations.

BACKGROUND

On January 21, 2020, Mr. Morris filed a class action complaint for declaratory and injunctive relief and a motion to certify a class under Rule 23. *See* Fed. R. Civ. P. 23(b)(2). Two months later, the parties stipulated to class certification. On March 17, 2020, the court certified a class consisting of all persons currently confined, or who would in the future be confined, in the Allen County Jail.

After a period of negotiations, last fall the class moved for summary judgment, seeking a declaratory judgment that the conditions at the Allen County Jail violate the Constitution and requesting the entry of appropriate injunctive relief. The court twice granted the defendants an extension to respond because negotiations between the parties continued. Briefing on the motion concluded on November 11, 2021. The sheriff conceded that summary judgment was appropriate, whereas the commissioners argued that they had satisfied their statutory duty to establish and maintain a jail—a question of law today, given the state of a largely undisputed factual record.

On December 16, 2021, the court held oral argument. During the hearing, the sheriff once again conceded that the numbers at the jail were too high and that something needed to be done to remedy the population issue [Tr. 11-12]. The commissioners conceded that there were no triable issues of fact but argued that they had satisfied their statutory duty to establish and maintain a jail [Tr. 13-16].

The court ordered the class to submit proposed factual findings as well as the text of any injunction order. The court further ordered the parties to meet and confer regarding the proposed order. The court ordered the defendants to file any objections to the proposed order after that opportunity to consult together. On February 2, 2022, the class filed its proposed factual findings and order. The sheriff filed a single objection. The commissioners filed several objections. The class filed a proposed reply to the objections on February 10, 2022. The motion stands ripe for ruling.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide

which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

A.   *Summary Judgment Against the Allen County Sheriff and Board of Commissioners.*

The Eighth Amendment governs claims for unconstitutional conditions of confinement for convicted prisoners, whereas the Fourteenth Amendment governs such claims for pretrial detainees. *See Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015); *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). This case requires analysis under both constitutional amendments given the scope of the class.

The Constitution doesn't mandate "comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and inmates cannot expect the "amenities, conveniences, and services of a good hotel," *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988). Prison conditions may be "harsh and uncomfortable" without violating the Constitution. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012), *abrogated on other grounds as recognized by Kemp v. Fulton Cnty.*, 27 F.4th 491, 495-96 (7th Cir. 2022). Inmates must be provided with adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *See Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). Overcrowding may constitute a constitutional violation when, combined with other factors, it has "a mutually enforcing effect that produces the deprivation of

a single, identifiable human need such as food, warmth, or exercise."[1] *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Overcrowding that leads to "unwholesome food, medical neglect and continuous threats to prisoners' safety," for instance, can "constitute cruel and unusual punishment." *French v. Owens*, 777 F.2d 1250, 1252 (7th Cir. 1985).

In evaluating an Eighth Amendment conditions of confinement claim, the court conducts both an objective and subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" such that a prison official's act results in the denial of "the minimal civilized measure of life's necessities." *Id.* (citations omitted). The subjective prong asks whether defendant acted with "deliberate indifference" to the inmate's health or safety. *Id.*; *see also Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (defining deliberate indifference). A confinement conditions claim under the Fourteenth Amendment requires pretrial detainees to prove only that the conditions are objectively unreasonable. *See Hardeman v. Curran*, 933 F.3d 816, 822-23 (7th Cir. 2019).

Given that the parties concede and the record reveals that no triable factual issues remain, the court must address one question of law—whether the commissioners have fulfilled their statutory duty to establish and maintain a county jail. The commissioners appeared for Allen County because they are one and the same here. *See Schon v. Frantz*, 156 N.E.3d 692, 700 (Ind. Ct. App. 2020). The commissioners oppose entry of judgment, arguing that they have satisfied their obligations under the law.

In Indiana, the commissioners have the duty to "establish and maintain a . . . county jail," Ind. Code § 36-2-2-24, whereas the sheriff has the duty to "take care of the county jail and the prisoners there," Ind. Code § 36-2-13-5(a)(7). The commissioners argue that they shouldn't be held liable because they have established and maintained the Allen County Jail pursuant to Indiana statute. They say

---

[1] The lack of exercise may rise to a constitutional violation in "extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened," *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996), though "no one could believe that a single 90–day denial of yard privileges would be a cruel and unusual punishment," *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001), as an example.

overcrowding is out of their control and any problems with the physical plant (*e.g.*, bursting pipes, sewer backups, and leaky roofs) aren't constitutional violations.

The court's primary goal in interpreting a statute is to determine and give effect to the legislature's intent. *See Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). "The best evidence of that intent is a statute's text." *Id.* When a statute is unambiguous, the court applies "the plain and ordinary meaning of the language." *Id.* When a statute remains open to more than one reasonable interpretation, the court uses rules of statutory construction. *Id.*

Maintaining a jail means something more than merely preserving a structure, no matter how small, limited, or confined. It means not only to keep or preserve something in repair and working order, but "to keep vigorous, effective, or unimpaired." *See Maintain*, Oxford English Dict. (2022); *cf. Jones v. State*, 807 N.E.2d 58, 66-67 (Ind. Ct. App. 2004) (interpreting maintain as "[t]o keep in a condition of good repair or efficiency" in the context of maintaining a common nuisance under Indiana law). A jail is "[a] place or building for the confinement of persons accused or convicted of a crime or offence; a prison." *Jail*, Oxford English Dict. (2022). No one could legitimately contend that the commissioners would have met their statutory duty by providing a closet for incarcerating hundreds of prisoners any more than one could seriously contend that they have maintained a jail through provision of an unsuitable or smaller building—one that left its purpose of safely and effectively incarcerating inmates impaired.

The commissioners cite two cases to distinguish the statutory obligations of the sheriff and the county—*Weatherholt* and *Donahue*. In *Weatherholt v. Spencer Cnty.*, 639 N.E.2d 354, 356 (Ind. Ct. App. 1994), the Indiana Court of Appeals explained that the "county's duty to maintain its jail is a duty to keep the jail open for use and in good repair. . . . [The county] is not responsible for administering the manner of an inmate's incarceration." The manner in which a county jail is administered "falls solely within the province of the sheriff." *Id.* at 357. The specific issue in *Weatherholt* was whether the county owed a duty to an inmate with a back condition who had requested a lower bunk, and the court decided that the county owed him no such duty under the circumstances. *Id.*

In *Donahue v. St. Joseph Cnty. ex rel. Bd. of Comm'rs of St. Joseph Cnty.*, 720 N.E.2d 1236, 1240 (Ind. Ct. App. 1999), the Indiana Court of Appeals reiterated its holding from *Weatherholt*—"that once the county establishes and then reasonably maintains the jail, it is not responsible for administering the manner of an inmate's incarceration." The inmate there was arrested for public intoxication. *Id.* at 1237. He became belligerent toward the officers who processed him at the county jail. *Id.* The inmate claimed that two officers injured him when they forced him to the ground. *Id.* at 1240. The court held that his tort claim concerned the manner in which the jail was administered, which fell solely within the sheriff's province. *Id.* at 1240-41.

These two tort-based cases recall the dichotomous duties of the sheriff and county as established by statute, but they provide little guidance on the quite separate issue today of whether the county has complied with its statutorily-mandated duty to maintain a jail when faced with demonstrable and historical overcrowding. The commissioners extrapolate from these two cases to argue that the class's claims generally relate to the jail's administration such that the court might enter judgment against the sheriff, but not them. But for over 130 years, the commissioners have retained the duty not just to provide but to maintain a county jail—and that means, by implication, that the sheriff must be given "the means of discharging [his] duty" to keep the jail and care for inmates. *Bd. of Comm'rs of Franklin Cnty. v. Bunting*, 12 N.E. 151, 151 (Ind. 1887) (building sheriff's residence with county jail fell within board's authority). After all, the statute must be read as a whole, bearing in mind that these duties of the sheriff and commissioners must walk hand-in-hand seamlessly, as intended by the Indiana General Assembly. *See id.*; *see also Hewitt v. Westfield Washington Sch. Corp.*, 46 N.E.3d 425, 431 (Ind. 2015) ("When construing and interpreting a statute, we must examine all parts of the same act together to promote harmony and consistency."); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 167-68, 180 (2012) (court should "consider the entire text, in view of its structure and of the physical and logical relation of its many parts," and the "provisions of a text should be interpreted in a way that renders them compatible").

Though certain issues at the Allen County Jail exclusively relate to jail administration (such as inadequate jail staffing), a separate root problem is that the jail is overcrowded because the physical space is too small. The commissioners don't dispute this fact. The jail's population has exceeded its 732 total bed capacity since at least 2016. This is more troubling given that the jail is considered operationally full at 80-85 percent of its total capacity to allow for the proper classification of inmates based on security restrictions, medical needs, and other factors. Because of overcrowding, every cell on a block often has an extra person sleeping on the floor. The jail commander and the team behind the Elevatus study—a space needs study—both project that the jail population will only continue to increase. Sheriff Gladieux cannot discharge his duty to take care of the prisoners at the jail because the commissioners have not provided a suitable jail—the necessary means to discharge his duty consistent with Indiana law.

The commissioners argue that the jail's physical problems—clogging pipes, maintenance issues related to the building's age, and the unsanitary condition of inmates having to sleep on the floor near toilets—aren't egregious enough to give rise to a constitutional violation on their part. Caring for the jail remains indisputably the sheriff's responsibility, but the commissioners skirt the fact that the jail's size is much too small to keep up with the increasing inmate population. They say the number of inmates remains outside their control. Though this may be so, the size of the jail building proves precisely within their authority. By law, the commissioners retain the duty not just to establish but to maintain a jail in such a way as to allow the sheriff to perform his duty of prisoner confinement and care. *See Bunting*, 12 N.E. at 151.

On the one hand, the commissioners argue that their statutory duty isn't implicated here; and on the other hand, they discuss the concerted actions they have taken to quell the challenges at the jail. They say they have engaged leaders in Allen County to understand better the prison population and to encourage any means to reduce the population. They engaged Elevatus Architecture to conduct a space needs study. They have taken other actions to assist Sheriff Gladieux to help control the jail population. The class points out that the commissioners weren't acting gratuitously in taking these actions but

recognizing their duty to establish and maintain a jail that ensures a physical structure that can safely and adequately hold the number of prisoners housed there. The undisputed facts demonstrate that the current jail falls short of meeting their statutory call, notwithstanding any past efforts at study and inmate reduction.

The commissioners argue that the class's claims concentrate on the potential for harm, but the Eighth Amendment requires actual harm to recover damages, citing *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996). This argument misses the mark because the class seeks injunctive relief, not monetary damages. *Babcock* doesn't "cover suits to enjoin continuing disregard for prisoners' safety." *Id.* at 273.

The commissioners also quote language from *Babcock* suggesting that they can defend against this suit for injunctive relief "by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." *Id.* at 272 (quoting *Farmer*, 511 U.S. at 846 n.9). Still, the next sentence of *Babcock* says that "*Farmer* thus provides an incentive for prison officials to . . . eliminate [safety risks] before tragedy strikes," *id.*; and the harm and substantial risks of serious harm to this class have yet to be eliminated here, nor have the commissioners demonstrated with evidence a likelihood that they will be. The fact remains that the harms persist, and have persisted for some time, and no plan currently exists to address them. The commissioners are aware of the jail's limitations. They have not disputed the Elevatus study that the county must pursue construction of a new jail, and still they have not requested appropriate funding to enable this project. Summary judgment must then be entered against the commissioners.

The class also sued Sheriff David Gladieux in his official capacity, but he concedes that summary judgment should be granted for the class. The conditions at the jail—stemming from overcrowding, understaffing, and lack of space—have denied prisoners the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. And Sheriff Gladieux is aware of these conditions at the jail but has been unable to rectify them. He concedes that he has acted with the necessary subjective intent. The

court thus must grant summary judgment against Sheriff Gladieux. *Cf. Huerta v. Ewing*, 2018 U.S. Dist. LEXIS 174120, 21-22 (S.D. Ind. Oct. 10, 2018) (finding constitutional violations when the defendants conceded that the jail didn't meet standards from overcrowding, understaffing, and inadequate space).

The court finds that the jail, based on "the totality of the conditions of confinement," violates the Eighth and Fourteenth Amendments to the Constitution. *DeMallory v. Cullen*, 855 F.2d 442, 445 (7th Cir. 1988). The overcrowding problem at the jail—which in turn has spawned an increased risk of violence, unsanitary and dangerous conditions in cells, insufficient recreation, and classification difficulties—has deprived this class of inmates "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. The defendants have acted with the requisite indifference. Accordingly, and without any genuine factual issues left for trial, the court enters summary judgment against both the sheriff and the commissioners.

B.    *Rulings on the Objections to the Proposed Factual Findings and Order.*

The court thus turns to the remedy—a permanent injunction. Permanent injunctive relief is appropriate if the movant demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). The decision whether to issue an injunction lies within the discretion of the court. *Id.* (citing *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013)). In this context, any injunction must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [prove] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

The parties submitted proposed factual findings and objections, and the court addresses these now. First, the sheriff and commissioners object to the portion of the proposed injunction order that requires them to take all necessary and appropriate steps to "[c]ommit sufficient staff in the Jail to ensure

that all prisoners eventually have access to recreation outside of their cell blocks for at least 5 one-hour periods per week." They object to an order requiring 5 one-hour periods of recreation per week because they say the class only sought 3 one-hour periods per week in its original brief. In the class's original brief, as part of its proposed injunctive relief addressed to a short-term solution, the class said "the plan must address the steps that defendants will be taking to provide prisoners at least three hours of recreation each week outside of their immediate cell areas" [ECF 41 at 34].

Though the class's proposed injunction order now requests that the prisoners eventually have access to 5 hours of recreation per week [ECF 56 at 17], it immediately follows that request by saying "[h]owever, as a temporary matter, until a long-term solution is reached as addressed below, prisoners shall have access outside of their cell blocks for at least 3 one-hour recreation periods a week" [*id.* at 17-18]. This then is consistent with its original brief—as part of a short-term solution, the class wants 3 hours of recreation per week. There is no hard date as to when the defendants would have to comply with the long-term goal of 5 one-hour periods of recreation per week. That issue can be taken up as the court continues to monitor compliance and progress with the injunction order. Accordingly, the court overrules this objection.

Second, the commissioners object to the proposed factual findings because the findings effectively seek to strike Richard Beck's declaration. The commissioners attached Mr. Beck's declaration to their response [ECF 50-1]. Mr. Beck is the President of the Allen County Board of Commissioners [*id.* ¶¶ 3-4]. He says he understands that "the Board of Commissioners has adequately maintained the Allen County Jail" [*id.* ¶ 5]. He further says the commissioners have encouraged implementation of any available means to reduce the prison population, entered into an agreement with Elevatus Architecture to conduct a space needs study, taken actions to assist the sheriff in controlling the jail population, worked with the sheriff to reduce contractually the number of federal prisoners at the jail by agreement with the United States Marshals Service (USMS), and entered into an agreement with Lagrange County to allow certain prisoners to be housed in the Lagrange County Jail [*id.* ¶¶ 6-10]. The commissioners say ignoring Mr.

Beck's declaration, particularly in regard to the jail's maintenance, would cast all findings in a light most favorable to the moving party.

The objection seems off the mark. The commissioners already conceded that no triable factual issues remain on this record, and indeed passed on the opportunity to file a statement of genuine disputes per local rule. Mr. Beck's factual statements also don't contradict material facts. They instead have been included as factual findings where appropriate. His conclusory statement that the commissioners have adequately maintained a jail inappropriately invades the legal issue reserved to the court.[2] Procedurally the court has shifted to find facts that support entry of a permanent injunction. Summary judgment, quite separately, concerns whether genuine fact issues remain for trial. The court thus overrules this objection for several reasons.

Third, the commissioners object to the inclusion of statements made by the sheriff's counsel at the hearing as part of the proposed factual findings [ECF 58 ¶¶ 4, 10].[3] They say these oral statements shouldn't be deemed admissions without citing any authority for that proposition. As the class points out in reply, a "verbal admission by [] counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings." *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002). But even as an admission, such a statement would constitute only an admission of the sheriff, not the commissioners. That said, no evidence has been submitted to the court to contradict these representations, and they appear reliable based on the prevailing record. The court thus overrules this objection, though the findings of fact have been revised appropriately.

---

[2] The commissioners also object to the lack of completeness in the statements concerning the facilities in the section labeled "The Inadequacy of the Current Physical Structure of the Jail," commencing at ¶ 100 of the proposed findings [ECF 58 ¶ 8]. The Commissioners don't say what is missing other than facts from Mr. Beck's declaration concerning the maintenance of the facility [*id.*]. Because Mr. Beck's statement that the commissioners have adequately maintained the jail is a legal conclusion, the court overrules this objection.

[3] Paragraph 28 indicates that "counsel for the Sheriff noted that the Jail's population on December 15, 2021 had been 811" [ECF 56 ¶ 28]. Paragraph 113 states that "the Court finds, based on the representation of defendants' counsel during the summary judgment argument, that Lagrange County is not taking 50 prisoners from the Allen County Jail at the current time" [*id.* ¶ 113].

Fourth, the commissioners object to paragraph 21, arguing that it contains a legal conclusion as to when the jail is above capacity. The finding in paragraph 21 that the jail is above capacity when it houses more than 80-85 percent of its beds is based on statements from the Allen County Jail Commander and correctional expert, Dr. Richard Kiekbusch. This finding doesn't equate to a constitutional violation, so it isn't a legal conclusion but instead a factual statement about correctional standards. The court overrules this objection.

Fifth, the commissioners object to paragraphs 30-35 because these paragraphs imply that prisoners sleep on the floor when instead they sleep on mattresses or boats on the floor. Paragraph 32 indicates that prisoners may be given plastic frames, or "boats," for their mattresses, but not all prisoners are provided with boats. The commissioners haven't disputed this fact on this record with evidence, and any slight rewording of these paragraphs wouldn't change the outcome today. The court overrules this objection.

Sixth, the commissioners object to paragraph 41 because it says the average number of prisoners has increased each year when paragraphs 23 and 24 contradict this conclusion. Paragraph 41 says the "Jail Commander observed that the population of the Jail continued to increase during his tenure, apart from the brief and limited COVID restrictions, and he can see no reason why the population will not continue to increase" [ECF 56 ¶ 41]. In reply, the class argues that the population numbers would have continued to increase if it weren't for COVID restrictions. Still, the average daily population slightly decreased from 876 in 2018 to 861 in 2019 before the COVID-19 pandemic [*id.* ¶ 24], so it wouldn't be accurate for the court to find that the population has continually increased year over year but for the COVID restrictions, which is what the class proposes in paragraphs 41 and 43. The court sustains this objection and removes the offending language from its findings.

Seventh, the commissioners object to paragraph 101 because it contains the legal conclusion at the crux of the case and to paragraphs 122-125 because they are essentially conclusions from the proposed facts and unnecessary. Paragraph 101 says the "Allen County Jail building is much too small for the

criminal justice needs of Allen County" [ECF 56 ¶ 101]. Similar to paragraph 21, this statement isn't a legal conclusion in the true sense because it doesn't tie the size of the building to any constitutional violation. It is indeed a factual reality. Though paragraphs 122-125 do nothing more than summarize the factual findings, the court isn't inclined to exclude them because they provide a helpful recap after 15 pages of background facts. The court overrules these objections.

Eighth, the commissioners object to paragraph 112 because, as they argue, it inappropriately concludes that the contract with the USMS to reserve beds for federal prisoners apparently hasn't been cancelled because federal prisoners remain in the jail [ECF 58 ¶ 10]. The commissioners say this conclusion isn't supported by the record. In reply, the class argues that the commissioners overlook the declaration from Steven J. Hecke, a federal prisoner at the Allen County Jail, who said he and two other federal prisoners have remained at the jail despite only having federal charges pending [ECF 51-1 ¶¶ 3-4]. Still, it is possible that the contract has been cancelled, but the cancellation hasn't yet effected the transfer of federal prisoners in total. The court thus sustains the objection because of an inadequate record, deletes "the contract has apparently not been cancelled" from paragraph 112, and revises the second sentence of the paragraph to reflect only that certain federal prisoners remain in the jail.

Ninth, and last, the commissioners object to the proposed injunctive relief because it does not include a statement or statements that would reflect any political restriction such as voting elements or decisions of any particular office or official who may not be subject to the injunction proposed. As the class contends in reply, the commissioners haven't explained why this injunction, or any injunction, should specify who is not covered by it. The injunction order binds not only the parties, but "the parties' officers, agents, servants, employees, and attorneys," as well as other persons who are in active concert or participation with any of them. Fed. R. Civ. P. 65(d)(2). The court overrules this objection.

## FACTUAL FINDINGS

Having ruled on the objections and independently reviewed the proposed order in light of the record, the court adopts the proposed order, as amended here.

A.      *Background on the Allen County Jail.*

      1.      The existing Allen County Jail was opened in 1981 and was added onto in 1994, 1998,

and most recently in 2004.

      2.      The jail has 732 permanent beds.

      3.      The jail is spread over five floors with the cell blocks, their locations, and their population

capacities as follows:

| Cell block | Built | Total beds | Male / Female | Cells w/ 1 bed | Cells w/ 2 beds | Cells w/ 6 beds | Dormitory | In-cell comms |
|---|---|---|---|---|---|---|---|---|
| A | 1981 | 36 | M | 4 | 16 | | | |
| B | 1981 | 40 | M | | 20 | | | |
| C | 1981 | 38 | M | 2 | 18 | | | |
| D | 1981 | 36 | M | 4 | 16 | | | |
| E | 1981 | 12 | M | | 6 | | | |
| F | 1981 | 8 | M | | 4 | | | |
| G | 1981 | 8 | M | | 4 | | | |
| W | 1981 | 12 | M | | 6 | | | |
| H | 1981 | 20 | M | | 10 | | | |
| K | 1981 | 20 | M | | 10 | | | |
| I | 1994 | 19 | M | 1 | 9 | | | |
| J | 1994 | 18 | M | 2 | 8 | | | |
| L | 1994 | 20 | M | | 10 | | | |
| M | 1994 | 20 | M | | 10 | | | |
| N | 1994 | 26 | M | | | | x | |
| O | 1994 | 20 | M | | | | x | |
| P | 1994 | 20 | F | | 10 | | | |
| Q | 1994 | 20 | F | | 10 | | | |
| S | 1998 | 24 | M | | | | x | |
| U | 1998 | 24 | M | | | | x | |
| X | 1998 | 12 | F | | 6 | | | |
| Y | 1998 | 8 | F | | 4 | | | |
| Z | 1998 | 20 | F | | 10 | | | |
| 6A | 2004 | 49 | M | 1 | 18 | 2 | | x |
| 6B | 2004 | 58 | M | | 20 | 3 | | x |
| 6C | 2004 | 49 | M | 1 | 18 | 2 | | x |
| 6D | 2004 | 58 | M | | 20 | | | x |
| 6F | 2004 | 34 | F | | 11 | 2 | | x |
| Rcvng | | 3 | | 3 | | | | |
| | | | | | | | | |
| Total | | 732 | | | | | | |

4.      The two-person cells in the original portion of the jail are 94.86 square feet. The cells in the 1994 and 1998 additions are 123.46 square feet. And the cells in the newest addition are 156.49 square feet.

5.      Each of the two-person cells contains two bunks affixed to the wall, one on top of the other, and a toilet-sink unit.

6.      The cells in the portions of the jail built after 1981 also contain a small stool and writing table, both affixed to the wall.

7.      The single-person cells contain the same fixtures as the other cells on their block, except that they do not have the upper bunk.

8.      The doors to the cells are solid, with a small window at eye height, and most have a small opening that unbolts to slide a food tray through.

9.      Outside the cells there is an area within a locked perimeter where prisoners can go during portions of the day. In this "day area" there are showers; metal tables affixed to the floor, with seating; a television; telephones; and kiosks used for video visitation.

10.     The four dormitory blocks feature steel bunk beds affixed to either the floor or wall.

11.     The dormitories also contain showers, tables, and a television.

12.     The cells in the five blocks added in the 2004 build-out—6A, 6B, 6C, 6D, and 6F—contain a call button that rings into the jail's control room in the downstairs area of the jail.

13.     None of the other blocks contain call buttons, either within individual cells or in the day rooms.

14.     There are video cameras that provide some visibility into each cell block.

15.     However, the cameras generally do not observe individual cells. There are three receiving cells that are sometimes used to house severely mentally ill prisoners, and these cells contain cameras. There are also a few cells in some of the blocks that have cameras in them, so they can be used to monitor suicidal detainees.

16.     The camera feed can be seen by officers in "modules" that are on the blocks, as well as the control room in the downstairs area of the jail.

17.     The jail also contains a 56-bed lockup unit for arrestees who are held for short periods of time. Although the Sheriff staffs the area, the beds are not included in the 732 figure or the population figures used in this memorandum, and the unit is not part of this litigation.

B.     *The Jail Population.*

18.     A jail is overcrowded long before every bed is filled. This is because there must be enough beds in the proper cell locations so that prisoners can be adequately classified and separated.

19.     As noted in a recent study of the Allen County criminal justice system commissioned by the Allen County Board of Commissioners and performed by Elevatus Architecture:

> [e]ven though the rated capacity is 741, the actual number at which the jail is considered operationally full is 593, which is 80% of rated capacity. The dynamics of a jail, with unpredictable inputs and daily fluctuations in population, require management flexibility in the form of a few empty beds. Because of this, a jail is at capacity before reaching its design limit, or rated capacity. Once the count starts to exceed the 80% level, properly classifying and placing inmates with like inmates becomes more difficult, and potentially dangerous for both inmates and staff, and you end up placing maximum security inmates among minimum security inmates, causing a possible volatile situation.

20.     The Allen County Jail Commander agreed that the Allen County Jail is overcrowded at 80-85 percent capacity, as above that amount to classify prisoners some will have to be placed in cells blocks where there are not available permanent beds. The plaintiffs' correctional expert, Dr. Richard Kiekbusch, noted that the "prevailing wisdom" indicates that prisoners should occupy roughly 83 percent of available beds.

21.     Accordingly, the court finds that the Allen County Jail is above-capacity when it houses more than 80 percent (586) to 85 percent (622) of its 732 beds.

22.     Not only does the Allen County Jail classify by separating male and female prisoners, but it also attempts to place prisoners in different cell blocks, based on the following classifications: general population, minimum security, maximum security, medical, and protective custody.

23.     The population of the jail regularly exceeds the 732 permanent beds, let alone the 80-85 percent figures noted above.

24.     The average daily population of the jail was as follows for the years noted:

| | |
|---|---|
| 2016 | 796 |
| 2017 | 820 |
| 2018 | 876 |
| 2019 | 861 |

25.     The average number of prisoners dipped in 2020 to 759, but this was because the Sheriff, attempting to manage the coronavirus epidemic, severely restricted the admission of new prisoners for two periods during the year, refusing to accept most persons charged with misdemeanors and nonviolent offenses.

26.     When these restrictions were not in place in 2020, the population at times exceeded 900.

27.     In 2021, the daily census of the Allen County Jail remains much greater than the facility's 732 beds. For example, the population was as noted below on the dates noted:

| | |
|---|---|
| February 28, 2021 | 783 |
| March 15, 2021 | 807 |
| March 31, 2021 | 788 |
| April 14, 2021 | 793 |
| May 5, 2021 | 774 |

28.     On the date of the summary judgment hearing, December 16, 2021, Sheriff's counsel noted that the jail's population on December 15, 2021 had been 811.

29.     Given that the jail is regularly over capacity, the Jail Commander believes that the current capacity of the Allen County Jail should be over 1,000.

30.     Because of the constant overcrowding in the Allen County Jail, prisoners are required to live in cells where they do not have a permanent bed and are, instead, forced to sleep on the floor of the cells with the permanent beds occupied by other prisoners.

31.     There are also prisoners on the floors of the dormitory blocks.

32.     Prisoners on the floor may be given plastic frames, or "boats," for their mattresses that allow the mattresses to be held three to four inches off the ground. However, not all prisoners are provided with boats.

33.     It is common for every cell on a block to have an extra person on the floor in each cell.

34.     There is only one prisoner on the floor in the two-person cells as there is not enough room in the cells for more than one additional mattress.

35.     Prisoners, including those on the floor of cells, are locked into their cells at night.

36.     Prisoners in the general non-disciplinary cell blocks are let out of their cells into the locked day area for parts of the day. Those in protective custody are released twice a day for an hour each time. Prisoners in the disciplinary units in the jail are allowed out for only one hour a day, and only one cell at a time.

37.     When prisoners are allowed out of their cells into the day areas, their cell doors remain open.

38.     There is no recreation equipment in the day areas, and vigorous physical activity is not possible there, both because of the lack of equipment and because of the lack of space.

39.     The jail has one indoor and one outdoor recreation area that are next to each other, but recreation has been suspended during the pandemic.

40.     Before the pandemic, prisoners were offered recreation for, at most, only one hour a week.

41.     The Jail Commander can see no reason why the population will not continue to increase.

42.     The Elevatus study projects that the average daily population of the Allen County Jail will increase by 20 persons a year.

43.     The court finds that the population of the jail has been increasing each year, save for a slight and momentary dip from 2018 to 2019, and is likely to continue to increase.

C.     *Prisoner Supervision and Jail Staffing.*

44.     There is a module in each block where staff can observe the common areas on the blocks, although most modules cover more than one block.

45.     At most, one correctional or confinement officer is typically assigned to each module.

46.     The correctional or confinement officers in the modules cannot see into the cells because the interiors of most cells are not visible by camera.

47.     Although the video feeds from the common areas of the cell blocks are also visible to officers who are in the main control room for the jail, it is the primary responsibility of the officer assigned to the block to monitor the camera, as the control room is observing multiple areas of the jail and is responsible for opening doors throughout the jail.

48.     A camera view is only a supplement to actual eyes-on observation of prisoners because, as noted by William Wilson of the Indiana Sheriff's Association who has performed numerous jail staffing summaries, including one of the Allen County Jail in 2013, "the camera only captures what happens at a particular moment. If a jail officer does not have eyes on the camera at the exact moment that happens, they will not be able to see what goes on." The use of technology "should be seen as supplement to the staff and not as a substitute."

49.     The visible presence of the staff has a positive bearing on how prisoners behave.

50.     Given that the jail is not designed so that prisoners can be constantly observed, frequent walk-throughs of the cell blocks are necessary.

51.     There are three shifts of staff at the jail—6:00 a.m. to 2:00 p.m., 2:00 p.m. to 10:00 p.m., and 10:00 p.m. to 6:00 a.m.

52.     Correctional staff are supposed to perform walk-throughs of the blocks every hour. However, prisoners cite numerous examples of staff entering the blocks much less frequently than that, and the court finds that the once-an-hour walkthroughs do not always occur.

53.     Prisoners report that frequently no correctional staff are present in the modules to supervise the prisoners, and the court finds that frequently staff are not present in the modules.

54.     During the overnight shift, only three of the modules are staffed.

55.     During the other shifts there is only one officer in each module, even in the modules that straddle two or more blocks. As a result, if the officer leaves the module to perform his or her duties, such as escorting prisoners off the block, conducting an inspection in a cell in one of the two modules that he or she may supervise, or for any other reason, the module will be empty, and the other prisoners on the block will be left unattended.

56.     The purpose of the Wilson staffing survey in 2013 was to determine whether the staffing levels at the jail had fallen to where the safety of prisoners and staff were in jeopardy.

57.     A jail must have sufficient staff to operate the jail's controls, complete necessary health and welfare checks, monitor prisoner areas for security and safety problems, maintain security, and properly admit and discharge prisoners.

58.     At the time of the Wilson survey in 2013, the jail had 130 correctional staff persons, or confinement officers, including the Jail Commander and Assistant Jail Commander.

59.     The Wilson survey concluded that this number was deficient in that "the Allen County Jail does not presently have sufficient staff resource hours (manpower) to patrol the jail, conduct important security operations, such as routine cell searches, and staff important areas of the Jail."

60.     At the current time, the jail has only 137 correctional or confinement officers, including the Jail Commander and Assistant Commander.

61.     The Wilson survey concluded that the Allen County Jail should have at least 171 correctional or confinement officers on staff.

62.     To protect both prisoners and the staff, the jail should have on staff at least the 171 persons referred to in the Wilson report.

63.     However, Mr. Wilson indicated that he would defer to the jail's estimate of what staffing level was necessary to assure safety.

64.     To place two staff persons in each module, which the Sheriff desires and which would mean that the cell blocks were never left unsupervised when one of the officers left the module, would require at least 201 staff persons, although Dr. Kiekbusch did a detailed analysis and calculated that 227 jail officers would be needed.

65.     The court finds that there is a lack of sufficient staffing in the jail and the lack of adequate staffing in the jail causes the following:

- daily deficiencies in controlling inmate behavior;

- daily deficiencies in observing prisoners;

- daily deficiencies in handling emergency backup;

- daily deficiencies in regulating prisoner movement;

- daily problems in controlling inmate contraband;

- daily deficiencies in providing recreation;

- continuous problems in providing adequate backup for staff; and

- monthly problems in providing staff training.

D.     *Ongoing Problems Caused by Overcrowding and Inadequate Supervision of Prisoners: Violence.*

66.     The overcrowded conditions of the jail—leading to persons sleeping on the floor in cells and more persons in day rooms than the spaces were designed for—raise prisoner tensions and cause frequent violence between prisoners and result in physical injuries to prisoners.

67.     The violence and injuries increase as the population of the jail increases.

68.     Prisoners also fight with staff and, again, there is a direct correlation between the jail's increased population levels and prisoners assaulting staff. As population and tensions rise, there are increased assaults on staff.

69.     In 2020, the jail recorded 40 prisoners being taken to the hospital because of violence between prisoners, with more being treated in the jail without hospitalizations.

70.     The jail is hampered in its ability to respond quickly to fights, as even if the single officer in the module observes the fight—which is not a given—he or she will not enter the block until another staff person arrives. This may take time as the staff will have to come from elsewhere in the multi-story building.

71.     However, as attested to by numerous prisoners and the Jail Commander, staff may never know about violence among prisoners. Either the guards are not present to be able to observe the violence, or the violence takes place in the numerous cell block areas that are not visible on the cameras.

72.     The staffing deficiencies in the jail means that direct supervision of prisoners is impossible, and this leads to violence.

73.     It also means that when prisoners are at risk of physical harm, they are not able to attract the attention of guards so that intervention can occur before injuries occur.

74.     The overpopulation of the jail and the lack of staff leads to frequent violence.

E.      *Ongoing Problems Caused by Overcrowding and Inadequate Supervision: Lack of Recreation.*

75.     An overcrowded jail is plagued by continuous and unrelenting tension, and one way of temporarily defusing this is through recreation.

76.     There is a direct correlation between the provision of recreation and the reduction of violence among prisoners.

77.     Adequate recreation is necessary to preserve both the physical and mental health of prisoners.

78.     Because of overcrowding, vigorous physical exercise is not possible in the day room areas in the cell blocks of the Allen County Jail.

79.     As noted, at most, prior to the pandemic prisoners were offered 1 hour of recreation a week. This is grossly insufficient as daily recreation is the standard accepted by the American Correctional Association.

F.      *Ongoing Problems Caused by Overcrowding and Inadequate Supervision: Staff's Inability to Respond to Emergencies.*

80.     At the current time, there is insufficient staffing in the jail to respond to emergencies. This creates ongoing dangerous conditions and causes harm to prisoners.

81.     It is essential to assure the safety of both prisoners and staff that that there be two officers in each module observing the block so that officers can notice and respond to both emergency and non-emergency events without leaving the block unattended and without direct supervision, as it is extremely dangerous for the safety and security of prisoners and the facility to leave prisoners unattended and without direct supervision.

82.     Without an officer supervising the block, incidents occur of which the staff is not immediately aware, and when there are urgent situations or emergencies, prisoners in most of the blocks must resort to kicking or banging on their doors or yelling to attract someone's attention, as most blocks do not have a call button or intercom system.

83.     Prisoners may be disciplined for making too much noise if they kick or bang on their cell doors.

84.     Frequently there are delayed responses by staff at the jail when prisoners are suffering serious medical or mental health events.

85.     Prisoners in the minority of cells that do have call buttons may not receive a prompt response even when they press on the call buttons.

G.     *Ongoing Problems Caused by Overcrowding and Inadequate Supervision: Other Serious Safety and Habitability Issues.*

86.     Prisoners who are forced to sleep on cell floors because of overcrowding will have to be stepped over when cellmates use the toilet and may have their heads close to the toilet.

87.     Prisoners on the floor are stepped on, kicked, and fallen on and have objects dropped on them by other prisoners.

88.     All this can cause violent reactions.

89.     It is disgusting to sleep with one's head next to a toilet being used by other persons.

90.     It is physically uncomfortable for prisoners on the floor of cells.

91.     The overcrowded conditions make it difficult to respond to non-emergent conditions concerning cell conditions.

92.     Overcrowding in a jail exacerbates all other problems in the jail environment, including causing delays in food delivery.

93.     Overcrowding in the Allen County Jail affects the ability to prepare and deliver food to prisoners in a timely manner.

94.     Food delivery to prisoners is frequently delayed and as a result food that is supposed to be served hot is served cold.

H.     *Ongoing Problems Caused by Overcrowding and Inadequate Supervision: Contraband in the Jail.*

95.     Because of the lack of staff, the jail has difficulty in controlling contraband.

96.     The possession of unlawful drugs by prisoners in the jail is widespread and pervasive.

I.     *Ongoing Problems Caused by Overcrowding and Inadequate Supervision: Difficulties with Prisoner Classification in the Jail.*

97.     The jail noted in December 2020 that it is generally able to classify prisoners properly in the jail, though this leads to prisoners being housed on cell floors. However, the court finds numerous more recent examples exist of prisoners not being classified properly.

98.     As a result, for example, prisoners charged with non-violent offenses are placed with prisoners charged with violent offenses. Those facing misdemeanors are placed with those charged with serious felonies, including murder. Prisoners with obvious physical or mental health needs are not placed appropriately.

99.     The improper classification results in vulnerable prisoners being preyed upon by others.

J.     *The Inadequacy of the Jail's Current Physical Structure.*

100.    The court agrees with the opinion of the Jail Commander that the jail does not have an "idea[l] layout."

101.    The Allen County Jail building is much too small for the criminal justice needs of Allen County.

102.    As noted, the jail's layout prevents continuous physical observance of the prisoners as it makes it impossible to observe prisoners without frequent walk-throughs by staff that simply do not occur.

103.    Nearly a third of the jail's beds are in the portion of the jail that was built 40 years ago.

104.    This portion of the jail is showing its age, with rotting and bursting pipes and sewer backups.

105.    Many sections of the jail have been plagued by leaky roofs.

106.    The physical structure of the jail, combined with the staffing deficiencies in the jail, leads directly to frequent inmate-on-inmate and inmate-on-staff violence and the inability of staff to respond to, or even know about, emergency situations in the cell blocks. This leads to physical injuries.

107.    The inadequacy of the overcrowded facility means that prisoners are forced to sleep on floors next to toilets where they are stepped upon, kicked, and fallen upon. This causes increased tension and violence.

108.    The inadequacy of the physical structure also means that prisoners are not properly classified, and this leads to prisoners being preyed upon by other prisoners and leads to conflicts in the cell blocks.

K.    *Allen County's Reaction to the Jail's Problems.*

109.    The court finds that the defendants—the Allen County Sheriff and Allen County, through the Allen County Board of Commissioners—as well as the Allen County Council are aware of the conditions and problems in the Allen County Jail.

110.    The court finds that the Allen County Commissioners, as the Allen County Board of Commissioners, are the duly elected executive of Allen County, Indiana. Ind. Code § 36-2-2-2.

111.    The defendants, along with the state courts, prosecutor, and community corrections, all believe that they have done everything possible to address the jail's population.

112.    The Board of Commissioners voted to terminate the contract with the United States Marshals Service under which approximately 60 beds were reserved for use by the USMS. However, certain federal prisoners remain confined at the jail.

113.    According to the President of the Allen County Board of Commissioners, Mr. Richard Beck, the Board of Commissioners entered a contract with Lagrange County to house up to 50 prisoners in the Lagrange County Jail. However, the Sheriff has represented that Lagrange County may not be taking 50 prisoners from the Allen County Jail at the current time.

114.    In 2020, Elevatus Architecture produced a proposal containing several options to create a new 6E block on the jail's fourth floor and expand 6F block, to add more permanent beds.

115.    The Elevatus option preferred by the Jail Commander would add 309 beds.

116.    Given the population pressures on the jail, adding this number of beds would do little to reduce the population of the jail to a level where it is not overcrowded.

117.    The Elevatus study concluded that, given the need for the jail to stay at or below 80 percent of capacity so that proper classification can occur, adding on to the existing jail is simply not a

viable option, as by the conclusion of the two-year construction project, the jail's projected population would already exceed 80 percent of that expanded capacity. The court credits this conclusion.

118.    Given the jail's current population and its projected future population, the Elevatus study "recommend[s] the county pursue the construction of a new jail on a site to be determined."

119.    The court finds that jail's physical structure precludes the jail expanding on its current site to a size that will remedy its endemic overcrowding and the harms flowing from the overcrowding.

120.    As the executive of Allen County, whose job it is to provide a jail facility, the Board of Commissioners, even if not requested by the Allen County Sheriff, may determine the need for a new jail and the County Council would then be requested by the Commissioners to fund the project.

121.    The Allen County Commissioners have not requested that the Allen County Council consider funding for an expanded or new Allen County Jail.

L.    *Summary of the Court's Findings of Fact.*

122.    The Allen County Jail is chronically overcrowded and chronically understaffed.

123.    This leads to a host of problems, specified above, which consistently both threaten and cause injury to prisoners confined in the jail.

124.    The existing physical structure of the Allen County Jail prevents the Allen County Sheriff from discharging his duty to care properly for the prisoners housed there.

125.    Any finding of fact should be deemed to be a conclusion of law to the extent necessary.

CONCLUSIONS OF LAW

The court, having determined that the conditions prevailing at the Allen County Jail violate the Eighth Amendment rights of convicted prisoners and the Fourteenth Amendment rights of pretrial detainees housed there, finds that the class is entitled to a permanent injunction because of the irreparable harm for which there is no adequate remedy at law and because both the balance of harms and public interest favor the issuance of this permanent injunction that will safeguard the class's constitutional rights.

The court further finds that its permanent injunction conforms to the requirements of the Prison Litigation Reform Act in that it "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In framing and issuing this injunction, the court, as required by federal law, has "give[n] substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

## PERMANENT INJUNCTION

Construing all facts and reasonable inferences in favor of the Allen County Sheriff and Allen County, the court GRANTS the class's summary judgment motion [ECF 40], their motion for leave to reply to the objections to the proposed factual findings and order [ECF 59], and the request for a permanent injunction.

Accordingly, the court ORDERS that defendants are permanently enjoined to take all necessary and appropriate steps to:

1.      Provide, through the defendants, a safe environment for the pretrial detainees and prisoners confined in the Allen County Jail.

2.      Commit, through the Sheriff, sufficient staff in the jail to ensure that prisoners receive adequate supervision.

3.      Commit, through the Sheriff, sufficient staff in the jail to ensure that all prisoners eventually have access to recreation outside their cell blocks for at least 5 one-hour periods per week, subject to the needs of safety and security that on occasion may interrupt this recreation as reasonably determined by the Allen County Sheriff or his designee. However, as a temporary matter, until a long-term solution is reached, prisoners must have access outside their cell blocks for at least 3 one-hour recreation periods a week.

The court further ORDERS that the defendants, within 45 days of this order, file with the court a plan specifying the following:

1.    The long-term solution that the defendants propose to resolve the problems leading to the constitutional deficiencies found to be present in the Allen County Jail. The plan must address how the following problems—all of which have led or contributed to the unconstitutional conditions in the jail—will be permanently resolved: prisoner overcrowding, lack of sufficient staff, lack of appropriate prisoner supervision, presence of prisoner-on-prisoner violence, lack of prisoner recreation, inadequate classification of prisoners, and any other matters that defendants believe must be addressed to resolve permanently the jail's constitutional deficiencies.

    a.    If the proposed long-term solution will involve construction of a new or expanded Allen County Jail, the plan must specify:

        i.    the general construction plan—*i.e.*, whether jail expansion or the construction of a new facility is contemplated;

        ii.    the anticipated benchmarks for expansion or construction leading up to the completion and occupancy dates. As appropriate, these benchmarks must include, without limitation, when the following events have occurred or will be occurring:

- execution of a purchase agreement for the property on which the jail will be located, if a new facility will be constructed;

- approval from zoning and planning authorities;

- hiring of an architect and construction manager;

- approval of final architectural and engineering documents;

- initiation of construction of the new facility, or the beginning of the renovation of the existing facility if the latter option is chosen;

- completion of construction of the new facility, or completion of the renovation of the existing facility if the latter option is chosen.

iii.    the prisoner occupancy of the new facility or of the renovation of the existing facility.

iv.    the date by which the Sheriff will have a staffing survey done to determine the proper staffing levels for the new or expanded facility. This survey must be done by a person or persons with the necessary expertise who uses acceptable correctional standards in the analysis. It must be done at the earliest appropriate opportunity before the opening of the new or expanded facility. The completed survey must be filed with the court and sent to the class's counsel within 14 days of its completion. Within 60 days of the survey's completion, the defendants must file a report with the court outlining, in as much detail as possible, all steps that the Sheriff plans to take to ensure that the staffing levels are met or why such efforts could not be made.

b.    If the long-term solution will not involve construction of any kind, the defendants must set out in detail how they propose to address the constitutional deficiencies and further specify the time frame for addressing each deficiency and what steps will be taken if the deficiencies remain after their initial efforts.

2.    The interim or short-term steps that defendants plan to take to address the constitutional deficiencies identified today in the Allen County Jail pending the accomplishment of the long-term solution. Specifically, the defendants must state the immediate and interim steps they will take to address overcrowding in the jail, lack of sufficient staffing and recreation, and inadequate supervision of prisoners. Among other things, the defendants must address:

a.    all steps that will be taken to attempt to maintain the population of the Allen County Jail at, or below, 732 pending implementation of the defendants' proposed long-term solution;

      b.      the steps that will be taken to provide each prisoner the opportunity for at least 3 hours a week of recreation outside their cell blocks;

      c.      the number of staff persons necessary to accomplish the steps noted immediately above, and how the number was computed;

      d.      the steps that they will take to commit sufficient correctional staff to provide the minimal level of staffing and to safeguard the health and safety of prisoners.

Within 10 days of defendants filing this plan, the class must file any objections or any other comments to the plan. The class must also propose future reporting requirements that it believes are appropriate given the long-term solution proposed by defendants.

The court will conduct a status conference on June 16, 2022 at 1:30 p.m. in a Fort Wayne courtroom. The purpose of the conference is to allow the court to review the long-term and short-term steps proposed by defendants and the class's response and to make any appropriate additional orders in furtherance of its continuing jurisdiction in this matter. The court ORDERS that, in addition to counsel, the Allen County Sheriff and the President of the Allen County Board of Commissioners be present for this conference. At this conference, the court will also set a schedule for further status reports and status conferences so that the court can monitor compliance and progress in this matter.

It is anticipated and expected that the class's counsel will continue to monitor conditions at the jail. So that they may do so, the court ORDERS that, no later than the 10th of each month, beginning with the month after this order is entered, the defendants must submit to the class's counsel the following information for the prior month:

1.      The population on each day in the month, to be measured at a time chosen by defendants. However, the same approximate time shall be used each day. Defendants may elect to submit this information to the class's counsel daily if that is an easier way to transmit the information.

2.      A summary of all incidents involving violence between prisoners or violence between prisoners and staff persons.

3.      The number of correctional staff on the personnel table and employed on the last day of the month.

4.      The frequency of recreation outside of the cell blocks offered to the prisoners. The dates offered to each block shall be noted and if the entire block was not offered recreation, that will be noted in a manner so plaintiffs' counsel can determine when and whether all persons in the block were offered recreation.

5.      A summary of the progress in meeting the long-term solution selected by defendants to resolve the constitutional deficiencies identified by the court.

The class retains the right to seek further injunctive relief if the relief today is not successful in resolving the constitutional deficiencies.

This court DIRECTS entry of final judgment for the class and against the defendants accordingly. The plaintiffs are prevailing parties and are entitled to their costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988. So that the parties have sufficient time to attempt to resolve the cost and fees claim without involvement by the court, the court, pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), extends the time for plaintiffs to file for attorney fees and costs to 60 days after the entry of judgment.

SO ORDERED.

March 31, 2022                          s/ Damon R. Leichty
                                       Judge, United States District Court